THE PEOPLE, *ex rel.* EDWIN SMITH, *v.* AZARIAH C. FLAGG.

Whether services, requiring such scientific knowledge and professional skill as those of a surveyor in the making a survey and map of the wharves and piers of New-York city, are, within the amended charter ( *ch.* 217 *of* 1853, § 12 ), work to be done under contract, to be made with the lowest bidder after public notice, *Quere.*

The comptroller of New-York is not compellable by mandamus to draw his warrant on the city treasury in payment of a claim for services, rendered to the city under the direction of one of the executive departments, until such claim has been allowed by the auditing bureau, although the common council has, by resolution, directed the payment of a specific sum.

The comptroller may require a detailed statement of the services of a city officer whose compensation is limited by law to a per diem allowance, although the common council has allowed him a gross sum for such services rendered in connection with others the compensation for which is not fixed by statute or ordinance.

APPEAL from the Supreme Court. Alternative mandamus requiring the comptroller of the city of New-York to draw his warrant for the payment to the relator of $1,250 as directed by a resolution of the boards of councilmen and aldermen returned by the mayor without approval or objection and thereby becoming a law, June 26, 1856.

The return of the comptroller stated that on the 28th of February, 1855, a resolution was passed by the mayor, aldermen and commonalty, directing the street commissioner to furnish copies of the map of wharves and piers of the North and East rivers, as originally drawn by Daniel Ewen, city surveyor, and embracing the alterations and additions to that date; that under said resolution the street commissioner employed the relator, who was then a city surveyor, to prepare the map, without advertising for proposals or the reception of sealed bids and the award of the contract to the lowest bidder, as required by section 12 of the amended charter of 1853; that the relator rendered a bill as and for a complete survey of all the wharves and piers, and as and for one job and not for day's work as a city surveyor; that a survey of the alterations and additions made since Ewen's map and a compilation from said map was all that was required or authorized by the resolution; that a large part of the bill is for work for which the common council were not bound to pay, and he therefore denies the validity of the subsequent resolution of June 26, 1856. He further states that by a letter dated February 2, 1856, he called

upon the relator for a detailed account of the piers and wharves surveyed, and the number of days employed in such survey, which the relator failed to present; for want of which statement and proper vouchers the comptroller was unable to determine what, if anything, was due to the relator, and therefore refused to draw his warrant. The relator demurred to the return. The demurrer was sustained and a peremptory mandamus awarded. This judgment was affirmed at general term in the second district and the comptroller appealed to this court. The cause was submitted on printed arguments.

*A. R. Lawrence, Jr.,* for the appellant.

*Monell, Willard & Howe,* for the respondents.

COMSTOCK, J. The resolution of February 28, 1855, only called for a certain number of copies of Ewen's map of wharves and piers, with the "alterations and additions" to that date. The relator was directed by the street commissioner to comply with the requirements of that resolution; but finding that the alterations and additions were so numerous as to render necessary a new survey and map, he proceeded accordingly, and, having completed his work, furnished five hundred lithographed copies to the common council. These were accepted by them, and they passed, on the 26th of June, 1856, a resolution, that he be paid for his services the sum of $1,250. As the case is thus far stated, I see no reason to doubt that the relator is entitled to compensation for his labor and disbursements.

If the common council had possessed no original authority to incur a debt of this kind, their recognition of the services and of the obligation to pay therefor would not have charged the corporation. (*Halstead* v. *The Mayor, &c.,* 3 *Comst.,* 430; *Hodges* v. *City of Buffalo,* 2 *Denio,* 110.) But no doubt is suggested that a surveyor could legally be employed on behalf

of the city, either to furnish copies of an original map, or to make new surveys and furnish a new map, exhibiting the streets, squares, wharves, piers, &c. The services, in this instance, went beyond the original employment, but they were subsequently r ecognized and agreed to be paid for in the resolution of June, 1856. This was equivalent to an original request, and created a just debt for some amount against the corporation.

The amended charter of 1853 ( *Laws of* 1853, 412, § 12 ) requires that " all work to be done and supplies to be furnished for the corporation, involving an expenditure of more than two hundred and fifty dollars, shall be by contract, founded on sealed bids, or on proposals made in compliance with public notice for the full period of ten days; and all such contracts, when given, shall be given to the lowest bidder, with adequate security." It is claimed on the part of the appellant that the services performed by the relator should have been contracted for with the lowest bidder, pursuant to this requirement of the charter. The language of this provision is certainly somewhat broad; but I am quite well satisfied that it does not include services of the particular kind now in question. In a large sense, the term " work" may include all labor, whether mental or corporeal ; but it has also a more restricted sense, which may confine it to the various kinds of manual labor, which may properly be the subject of general competition, and can be safely awarded to the lowest bidder. It would be an unreasonable and mischievous construction of the statute, to apply it to services which require in their proper performance scientific knowledge or professional skill. I do not believe that the services of a lawyer, of a physician, or those upon which the claim in the present case is founded, are embraced within the provision.

There are, however, one or two other objections, which, it appears to me, should have been held fatal on the motion for a mandamus. By the amended charter of 1849 ( *Stat.*,

280, § 11), an executive department in the government of New-York city was constituted, denominated the "Department of Finances." It was made the duty of this department to settle and adjust all claims whatsoever, and all accounts whatsoever, in which the corporation is concerned as debtor or creditor. The comptroller was declared to be the chief officer of this department. By section 13 of the amended charter of 1853, an auditing bureau in the finance department was created, with an auditor of accounts as the chief officer. This bureau, it is declared, "shall audit, revise, credit and settle all accounts in which the city is concerned as debtor or creditor." Every claim against the corporation is to be certified from the auditing bureau to the comptroller, with the sum allowed, and the reasons for such allowance. In awarding the mandamus commanding the comptroller to draw his warrant in favor of the relator for the sum claimed by him, no attention appears to have been given to these provisions of law.

It has been observed that the resolution of the council, recognizing the relator's services, was equivalent to an original request that he perform those services, and bound the corporation to pay for them. But if we give any effect to the clauses in the charter which have been quoted, the comptroller could not be compelled to draw his warrant until the claim was audited, according to law. The due employment of the relator by the common council, or their recognition of his services, gave him a just claim against the corporation, and a right to have his account audited in the manner provided. But it was not within the power of the council to determine that a particular sum was due to him for his labor and disbursements, or to require the comptroller to draw his warrant for the payment of such sum. The adjustment of the amount belonged to the auditing bureau in the department of finance, and if that department or bureau should refuse to audit it, a mandamus would be an appropriate remedy to compel them to do so. When

the claim is thus audited, it is presumed that the comptroller can be compelled by mandamus to draw his warrant for the sum allowed.

. The common council appear also to have proceeded in disregard of section 229 of the ordinance organizing the departments of the city government, and of the 10th section of the amended charter of 1853. By that section of the ordinance it was provided that a city surveyor, employed by the street commissioner to make a survey, shall be paid at the rate of $3 per day, and the further sum of $1 per day may be allowed for an assistant, when necessary. By the 10th section of the amended charter, it is declared that "no additional allowance, beyond the legal claim for any service, shall ever be allowed." Now, the relator, as the return shows, was a city surveyor, in the surveying bureau. So far, therefore, as his account consisted of services rendered by himself or his assistants, in making the surveys of wharves and piers, the rate of compensation was fixed by the ordinance referred to, and the statute of 1853 absolutely took from the common council the power of making any other allowance. The comptrollor had a right to require the relator, as he did by his letter of February 2d, 1856, to make a detailed statement, showing the piers and wharves surveyed, and the time occupied in making such survey.

The demurrer to the return of the comptroller to the alternative mandamus was not well taken. The judgment should be reversed for these reasons, and the mandamus denied.

ROOSEVELT, J., delivered an opinion, holding that the employment of the relator by the street commissioner, to make a new survey and map, was unauthorized by the original resolution of the common council; that the employment by private contract, without advertising for proposals, was prohibited by statute, and that the common council could not, by its ratification, subject the city to the payment of a

claim which in itself was not a legal charge. In regard to the objection founded upon the statute requiring notice and contract with the lowest bidder, he said:

Admitting, however, that a resolution of the common council purporting to assume a liability which had no legal foundation would be void, the relator insists that his claim, which the common council assumed, was not of that character, and that the objection, therefore, however sound, is not applicable. The services rendered by him were not, he contends, within the true intent and meaning of the term "work;" and although the words used in the statute are "*all* work to be done," and although such words are seemingly universal, he insists that work such as his, strictly professional, and requiring learning, skill and experience for its successful performance, is impliedly excepted. Would the legislature, asks his counsel, require the corporation, for instance, to do its suing and being sued by contract, to be given to the lowest bidder? And yet, when a lawyer brings an action against his client, his fees are uniformly described in the complaint as compensation for "work, labor and services."

Notwithstanding the seeming absurdity, at first blush, in this illustration, I am not prepared to say that, were there not a special statute regulating the office of corporation counsel, it might not be advantageous to the city to get its law business done in gross at so much per annum, "by contract, to be given to the lowest bidder, *with adequate security.*" Be this as it may, it is sufficient for the present purpose that the question now presented is one of a different character. The work to be done for the corporation, under the resolution in controversy, was the "furnishing," by the street commissioner, of about one hundred copies of Ewen's map, already paid for, of the wharves and piers of the city, embracing the alterations and additions subsequently made. Was there anything in this work so peculiar that it could only be done properly by one man? Of all the surveyors in

New-York, and out of it, was Mr. Smith the only one competent to the task? Could no other individual, after ten days' public notice, be procured, in any section of the country, to whom the performance of such a work might be entrusted, even " with adequate security" that he should at all events do it, and do it well? A negative answer, as it seems to me, to such a question, would be preposterous.

Besides, the law does not, as seems to be assumed, require that the bidders in such a case should themselves be surveyors. Any person, giving adequate security that the job shall be well done, may bid for the contract. If well done, whether done by himself or done by another is a matter of indifference. The law looks to the work and its cost, and not to the workman.

Again, it is said that the services rendered were beneficial to the corporation; that an implied promise to pay resulted from such benefit, and that the resolution fixing the amount was only a written expression of an obligation previously existing.

If this doctrine were to prevail, what would become of the restraints of legislation? The members and officers of the corporation would only have to tell their favorites to go on, without law, and then, by assuming the work, make the obligation binding, not on themselves, but on the tax payers. If contracts, without competition, were thus to be implied, how many express contracts would ever be awarded to "lowest bidders?" Even as the law stands, there is abundant evasion. Two hundred and fifty dollar jobs, as the records of the courts show, have become unusually numerous. Large jobs, calling for an expenditure of more than $250, are subdivided into fractional parts, and thus evasively placed within the exceptional provision. Should the doctrine of implied contracts be also sanctioned, the statute, in all its parts, would soon become a dead letter, and the correction of abuses, however gross, to any degree, however limited, be regarded as a mere utopian dream.

The court reserved its opinion upon the question whether the services of the relator were of such a character as to come within the statute requiring advertisement and contract with the lowest bidder, putting the judgment upon the other grounds stated.

Judgment reversed and mandamus denied.