171 N.J. Super. 480 (1979)
410 A.2d 52
AUTOTOTE LIMITED, PLAINTIFF-APPELLANT,
v.
NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, AND AMERICAN TOTALISATOR COMPANY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1979.
Decided December 13, 1979.
*483 Before Judges SEIDMAN, MICHELS and DEVINE.
Robert C. Epstein argued the cause for appellant (Hannoch, Weisman, Stern & Besser, attorneys; Robert C. Epstein on the brief).
James R. Zazzali argued the cause for respondent New Jersey Sports and Exposition Authority (Zazzali, Zazzali & Whipple, attorneys; James R. Zazzali, of counsel and on the brief).
Joel H. Sterns argued the cause for the respondent American Totalisator Company (Sterns, Herbert & Weinroth, attorneys; Joel H. Sterns and William J. Bigham of counsel and on the brief).
The opinion of the court was delivered by DEVINE, J.A.D.
Plaintiff Autotote Limited filed a complaint in the Law Division seeking to set aside the award of a contract by defendant New Jersey Sports and Exposition Authority (Authority) to defendant American Totalisator Company (American) covering the installation and servicing of a totalisator system at the Meadowlands racetrack on the principal ground that it violated the provisions of the public bidding statute, N.J.S.A. 5:10-21. The Law Division granted defendants' motion for summary judgment dismissing the complaint, based on a finding that the contract fell within the statutory "professional services" exemption. Plaintiff appeals.
Defendant Authority operates a racetrack within the Meadowlands complex pursuant to N.J.S.A. 5:10-1 et seq. Among other things, the enabling legislation provides, under N.J.S.A. 5:10-21:

*484 The authority, in the exercise of its authority to make and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, shall adopt standing rules and procedures providing that, except as hereinafter provided, no contract on behalf of the authority shall be entered into for the doing of any work, or for the hiring of equipment or vehicles, where the sum expended exceeds the sum of $2,500.00 unless the authority shall first publicly advertise for bids therefor, and shall award the contract to the lowest responsible bidder; provided, however, that such advertising shall not be required where the contract to be entered into is one for the furnishing or performing services of a professional nature . .. This section shall not prevent the authority from having any work done by its own employees, nor shall it apply to repairs, or to the furnishing of materials, supplies or labor, or the hiring of equipment or vehicles, when the safety or protection of its or other public property or the public convenience require, or the exigency of the authority's service will not admit of such advertisement. In such case the authority shall, by resolution, passed by the affirmative vote of a majority of its members, declare the exigency or emergency to exist, and set forth in the resolution the nature thereof and the approximate amount to be so expended. [Emphasis supplied].
The racetrack commenced operations in September 1976. Prior to the opening the Authority sought proposals from plaintiff and defendant American for the installation of a totalisator system, which involved a computer network designed to tabulate and categorize the monies wagered on each horse in each race, and to determine the pay-off for each race, including the daily double, exacta, etc. Bids were not sought, but ultimately a lease was entered into with plaintiff covering the period from October 30, 1975 to August 1979, under which plaintiff installed a totalisator system at the track. The lease was authorized by an Authority resolution dated September 11, 1975.
Initially, the resolution recognized that "in the normal course of events" contracts exceeding $2500 must be advertised, and "the installation of the totalisator system is a technical service of a professional nature." But under the primary resolving section the letting of the contract without advertising was said *485 to be based on an exigency of the Authority's service declared to exist which "would not admit of public advertisement of its intention to let a totalisator service contract." Only by a subsequent, secondary resolution was it stated that "in any event the Authority concludes that the major protions [sic] of the contract to be let relate to services of a technical and professional nature."
During the course of plaintiff's lease the state of the totalisator art advanced to a point where there evolved a sophisticated system known as "sell/pay" or "sell/cash." Its operation is succinctly described in an affidavit filed with the trial court:
... The TIM 300 System, also commonly referred to as a cash/sell system, permits racing patrons to go to any window to place wagers of any amount between $1 and $250 in any betting pool in any race to be run that day, and also permits such patrons to cash current or previous days winning tickets at any window under the complete control of the computer system. This system obviates the racetrack's need for separate windows for selling different wager types and denominations and separate windows for the cashing of tickets. The system provides for a high wagering capacity in the vital moments just prior to the start of races when the majority of wagers are placed.
The Authority became aware of the advantages of the new "sell/pay" and in 1977 requested both plaintiff and defendant American to submit proposals relating to the installation of the new system at the track to commence in September 1979 on the expiration of plaintiff's existing lease. In October 1978 plaintiff was permitted to install a pilot system at the track for a period of seven days. Apparently it malfunctioned, causing the Authority to conclude that it was not sufficiently reliable. Further negotiations with plaintiff were terminated, and the American proposal was accepted.
The contract between the Authority and American, dated February 23, 1979, is for a period of five years commencing "with the date on which racing begins closest to September 1, 1979." It provides for the furnishing of a computerized central *486 processing system, along with 450 terminals capable of printing and issuing tickets and receiving winning ticket information, and obliges American to maintain and to furnish an adequate staff of technicians to maintain the system in good and adequate condition, and to provide "its usual training services relating to the System to the training representatives of the Association."
Defendants contend that plaintiff lacks standing to maintain the action, citing Waszen v. Atlantic City, 1 N.J. 272 (1949); J. Turco Paving Con. Inc. v. Orange, 89 N.J. Super. 93 (1965), and Pucillo v. New Milford, 73 N.J. 349 (1977). They admit that all of the cases consider the issue of standing as applied to one who submits a bid, and support the rationale that one who takes advantage of a contract to be awarded under illegal specification cannot, when unsuccessful, seek to have the contract set aside. But it is argued that the rationale should be applied in the present instance because plaintiff participated in similar negotiations in securing the 1976 contract to its ultimate profit, and should now be estopped. This argument assumes that plaintiff was awarded the contract under the "professional services" exemption. We do not agree.
The Authority's resolution of 1975, under which it awarded the initial contract to plaintiff, was grounded primarily on "exigent" circumstances, and secondarily on services of a "technical and professional nature." The particular segment relied upon by the Authority in awarding the contract to plaintiff is not completely clear on the record, but it may be fairly inferred that the early opening of the track, coupled with the critical need for a totalisator system, created the exigency referred to in the resolution. It follows that the secondary ground of the resolution was surplusage. Accordingly, we choose to follow Capasso v. Pucillo, 132 N.J. Super. 542 (Ch.Div. 1974), aff'd 132 N.J. Super. 473 (App.Div. 1974). In that case the Town of Belleville advertised for bids for the collection of garbage. The bids were to be opened by the governing body, but before they were, *487 the town entered into a two-year contract with its present collector and dispensed with the bidding procedure. In response to a challenge to plaintiff's standing, it was held that "the fact that they were potential bidders and their ability to bid was thwarted by the action of the board of commissioners in entering into a contract as a result of private negotiations gives them standing to contest the action." [132 N.J. Super. at 546]
Defendants assert that the determination by the Authority that the installation of the cash/sell system constituted "furnishing or performing services of a professional nature" is presumptively valid. The contention is supported by the unqualified statement: "It was pursuant to that determination that the initial totalisator services contract was awarded to plaintiff and the second contract was awarded to Amtote." Nowhere in the record do we find a clear nexus, by resolution or otherwise, between the present contract and the "professional services" exemption. Accordingly, we interpret the statement as meaning that the Authority, in awarding the contract, relied on a precedent arising out of the 1975 Authority resolution and the award of the initial contract to plaintiff. We have heretofore expressed the opinion that the genesis of plaintiff's contract was "exigency." But assuming, arguendo, that the contract was motivated by the Authority's interpretation of the definition of professional services, it does not follow that it must be afforded great weight under any factual context. In New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544 (1978), the court said:
This deference [accorded] to agency interpretation of statutes is, of course, not total, as the courts remain the "final authorities" on issues of statutory construction and are not obliged to "rubber stamp" their approval of the administrative interpretation. [at 575]
See, also, Service Armament Co. v. Hyland, 70 N.J. 550, 561 (1976); Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 93 (1973).
*488 Judicial reluctance to accept an agency's determination is especially significant where, as here, no administrative expertise is involved. Accordingly, we are of the opinion that the interpretation of the statute before us is a judicial function to be exercised free from any administrative stricture.
In the course of his oral opinion the trial judge, referring to American's contract, observed that "there is no question at all that it can be a competitive bid." But in his final analysis he held that the contract was a combination of professional services and hiring of equipment, and that bidding was not necessary since it fell within the professional service exception. In so finding he relied solely on American Totalisator Co. v. Western Reg'l Off-Track Betting Corp., 44 A.D.2d 301, 396 N.Y.S.2d 301 (App.Div. 1974), in which the present defendant American sought to challenge the awarding of a contract for the furnishing of similar equipment without public bidding. The New York court held that the setting up and operation of computer data control services for off-track betting, and the providing of scientific and technical service, are to be equated with "scientific knowledge or professional skill" which fall without the public bidding statute.
There is a fundamental factual difference between the New York case and the present one. There it appeared the computer services furnished were not performed at the off-track betting site but presumably by the contractor's employees at a central location, and then transmitted to the site. Thus, service was the predominant element. More importantly, the New York court was interpreting the legislative intent of two related New York statutes, one of which was keyed to municipal contracts by specific reference; the second made specific reference to the providing of data-processing services on a transaction fee basis, which services "are not described conceptually as either the leasing or purchasing of computers." Id. 396 N.Y.S.2d at 302.
*489 The interpretation of out-of-state statutes by the courts of the jurisdictions are rarely helpful in providing an appropriate key to the interpretation of a New Jersey statute because of differing public policy concepts and objectives. The New York case does not provide assistance. We find it to be inapposite.
Although the present contract does provide for elements of service such as maintenance, monitoring and training, the principal object of the Authority was to obtain, and American to supply, a highly sophisticated totalisator which provided the sell/cash advantages. Therefore, the agreement was primarily one for the hiring of equipment rather than the hiring of a service. But the trial court found the contract to be a hybrid involving both equipment and services, and chose to label the services as "professional." Accepting the basic premise, we disagree with the conclusion reached.
The Local Public Contract Law, N.J.S.A. 40:50-1, and its predecessors, applicable to counties and municipalities, uniformly provide that contracts or agreements for "the doing of any work or for the furnishing of any materials" which exceed a specified sum must be advertised for bids and awarded to the lowest responsible bidder. The principal variable noted in the statutory sequence is the amount, which has increased from $500 to $2,500. See Delker v. Atlantic Freeholder Bd., 90 N.J.L. 473, 475-476 (E. & A. 1917). An early interpretation of "work and labor" excluded professional services. In Heston v. Atlantic City, 93 N.J.L. 317 (1919), our former Supreme Court considered an auditor's services and noted that
... the services to be rendered under this resolution were of a character involving peculiar professional education and experience, which invariably have differentiated their possessor in the industrial, economic and social environment of life, from one possessed only of the capacity to furnish work and labor as those terms are commonly accepted. Such services are comparable in character *490 with the special services of counsel, the employment of a physician, or like expert service in the discharge of municipal administrative requirements; .... [at 320]
The court then considered the legislative intent and concluded:
In this connection the maxim of interpretation and construction, nositur a sociis, is not without its practical application.
Thus, we find in the act sub judice the words "the doing of any work," followed in the disjunctive by "the furnishing of any materials or labor." Such a connotation indicates the acceptance by the legislative mind of the economic, industrial and popular understanding and use of the words "work, materials and labor," and distinguished from the services rendered in a professional capacity by an expert accountant, who has neither work, labor nor materials, eo nomine, to sell in market overt. [at 321; citations omitted]
The paucity of later case law undergirds the premise of a general acceptance of the definition of "professional services" delineated in Heston. Support for this conclusion is found in Capasso v. Pucillo, supra, where the court noted:
... There are, of course, exceptions to the bidding statutes. The exceptions are generally grounded in situations where public bidding would be meaningless or impractical. It was always the law that public bidding was dispensed with where the municipality or other governmental unit was contracting for professional services, whether medical, legal or otherwise. Professional services are not to be secured by public bidding because there is something inherent in the process which would nullify or detract from the professional quality of the services being sought [132 N.J. Super. at 550; emphasis supplied]
Further support is found in a review of the legislative history of N.J.S.A. 40A:11-1 et seq., which repealed N.J.S.A. 40:50-1, and of N.J.S.A. 5:10-1 et seq.
The repealer, N.J.S.A. 40A:11-1 et seq., came into being as L. 1971, c. 198, approved June 9, 1971 and effective July 1, 1971. It specifically exempted "professional services," which were defined as "services rendered or performed by a person authorized by law to practice a recognized profession and whose practice is regulated by law."
*491 N.J.S.A. 5:10-1 et seq. was passed during the same session as L. 1971, c. 137, approved and effective May 10, 1971. As has been noted, professional services were exempted under N.J.S.A. 5:10-21, but not defined.
By amendments through 1977 the definition of professional services in N.J.S.A. 40A:11-1 was expanded to exclude "general academic instruction or apprenticeship and training" and to include work "in a recognized field of artistic endeavor," and a new exemption added, entitled "Extraordinary unspecified services," defined to mean "services which are specialized and qualitative in nature requiring expertise, extensive training and proven reputation in a field of endeavor." N.J.S.A. 40A:11-2. For present purposes we are not called upon to determine the meaning and scope of the new exemption. It is sufficient to note that the Legislature chose not to engraft it onto N.J.S.A. 5:10-21.
The Legislature is presumed to be familiar with its own enactments and with judicial declarations relating to them. State v. Federanko, 26 N.J. 119, 129 (1958). Accordingly, it may be assumed that when in 1971 the Legislature amended the general public contracts bidding law to include a definition of professional services, it intended to codify the then existing case law. And since, during the same session, it passed both N.J.S.A. 40A:11-1 et seq. and N.J.S.A. 5:10-21 within one month of each other, it is reasonable to assume that the terminology "professional services" used in both was to carry the same meaning. Since N.J.S.A. 5:10-21 has not been amended, the conclusion follows that the professional service exemption as defined in 1971 remains viable, and is to be construed strictly.
In light of what has been said above, we conclude the services hereindescribed do not fall within the ambit of the professional services exemption, and that the public bidding requirement should have been followed.
*492 The public policy underlying bidding statutes is delineated in Terminal Constr. Corp. v. Atlantic Cty. Sewage Auth., 67 N.J. 403 (1975):
... Bidding statutes are for the benefit of taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. [at 409-410]
We do not question the good faith of the Authority, nor do we in any sense judge the respective merits of the product and services offered by the competing litigants. Rather, we seek only to preserve the underlying, salutary purpose of the public bidding statutes, and to observe the cautionary directive of Hillside Tp. v. Sternin, 25 N.J. 317 (1957):
In this field it is better to leave the door tightly closed than permit it to be ajar, thus necessitating forevermore in such cases speculation as to whether or not it was purposely left that way. [at 336]
It should be self-evident that the existing contract cannot be terminated immediately. Accordingly, for reasons of public interest and convenience it may continue in effect until September 1, 1980. In the interim the Authority shall proceed expeditiously to frame appropriate specifications for services and equipment to be furnished and to solicit bids therefor through public advertisement strictly in accordance with applicable statutes.
The judgment entered is reversed and the matter is remanded to the Law Division for the entry of a judgment consonant with this opinion. We do not retain jurisdiction.