AUTOTOTE LIMITED, PLAINTIFF-RESPONDENT, v. NEW JER-
SEY SPORTS AND EXPOSITION AUTHORITY AND AMERI-
CAN TOTALISATOR COMPANY, DEFENDANTS-APPEL-
LANTS.

Argued November 18, 1980—Decided March 23, 1981.

364

*Joel H. Sterns* argued the cause for appellant American Totalisator Company (*Sterns, Herbert and Weinroth,* attorneys; *Joel H. Sterns* and *William J. Bigham* on the briefs).

*James R. Zazzali* argued the cause for appellant New Jersey Sports and Exposition Authority (*Zazzali, Zazzali and Whipple,* attorneys).

*Robert C. Epstein* argued the cause for respondent (*Hannoch, Weisman, Stern, Besser, Berkowitz and Kinney,* attorneys).

The opinion of the Court was delivered by

SULLIVAN, J.

The principal issue raised in this appeal is whether a negotiated five-year contract awarded by defendant New Jersey Sports and Exposition Authority (Authority) to defendant American Totalisator Company (Amtote), covering the installation and servicing of a totalisator system [1] at the Meadowlands racetrack, violated the public bidding provisions of the New Jersey Sports and Exposition Authority Law, *N.J.S.A.* 5:10–1 *et seq.* Plaintiff, Autotote Limited (Autotote), which also designs and supplies totalisator systems, filed suit seeking to have the contract set aside on the ground that the subject matter thereof (the furnishing of totalisator equipment and services) was subject to the public bidding requirements of the statute.

The pertinent section of the New Jersey Sports and Exposition Authority Law under which the defendant Authority operates contains the following provisions regarding public bidding:

> The authority, in the exercise of its authority to make and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, shall adopt standing rules and procedures providing that, except as hereinafter provided, no contract on behalf of the authority shall be entered into for the doing of any work, or for the hiring of equipment or

---

[1] A totalisator system involves a complex computer network designed to tabulate and categorize the bets made on every horse in each race. The system also determines the payoff for each race, including the specialty wagers (exacta, daily double, etc.).

vehicles, where the sum to be expended exceeds the sum of $2,500.00 unless the authority shall first publicly advertise for bids therefor, and shall award the contract to the lowest responsible bidder; provided, however, that such advertising shall not be required where the contract to be entered into is one for the furnishing or performing services of a professional nature.... This section shall not prevent the authority from having any work done by its own employees, nor shall it apply to repairs, or to the furnishing of materials, supplies or labor, or the hiring of equipment or vehicles, when the safety or protection of its or other public property or the public convenience require, or the exigency of the authority's service will not admit of such advertisement. In such case the authority shall, by resolution, passed by the affirmative vote of a majority of its members, declare the exigency or emergency to exist, and set forth in the resolution the nature thereof and the approximate amount to be so expended. [*N.J.S.A.* 5:10–21]

The essential facts leading up to the present litigation are not in dispute. In 1975 the Authority, in preparation for the initial opening of the Meadowlands racetrack in September 1976, solicited proposals from Autotote and Amtote for the installation and servicing of a totalisator system at the racetrack. Both parties submitted proposals which were analyzed by the Authority, taking into consideration the experience, reputation, financial ability and stability of each company together with the quality of the equipment and services each proposed to supply. The Autotote proposal ultimately was accepted by the Authority and a three-year contract, commencing September 1976 was negotiated. This contract was not put up for public bidding. The Authority, in its resolution awarding the contract to Autotote, set forth two grounds for not advertising for public bids: first, that "an exigency of the Authority's service ... exist[ed], which exigency would not admit of public advertisement" and second, that "the major portions of the contract ... relate to services of a technical and professional nature." The Autotote totalisator was then installed at the Meadowlands and remained in operation for the three-year term.

During the course of the contract, the Authority became aware of the development of an improved and more efficient totalisator known as a "cash/sell" system. Late in 1977, the Authority solicited proposals from Autotote and Amtote regarding the installation of a cash/sell system at the Meadowlands.

At this time, Autotote did not have a cash/sell totalisator in use at any racetrack although it was in the process of developing the new system. Accordingly, it agreed to install demonstration machines in one of the betting divisions at the Meadowlands. During the course of the demonstration in October 1978, the machines repeatedly malfunctioned despite attempts by Autotote personnel to correct the problems. New machines were installed but they also failed, causing great inconvenience and confusion to Meadowlands patrons. The Authority finally terminated the demonstration after a week of failures, having reached the conclusion that the proposed Autotote cash/sell system was too unreliable to risk installation.

The Authority then communicated with defendant Amtote to see if it would be interested in "updating" its original proposal to provide a cash/sell totalisator system in time for the commencement of the September 1979 racing season at the Meadowlands. Amtote had designed the TIM 300 system,[2] an advanced type cash/sell totalisator, which was in operation at a number of racetracks. After observing the Amtote system in operation, and being satisfied with the efficiency and reliability of the system in an actual wagering situation, the Authority entered into negotiations with Amtote which culminated in the execution on February 23, 1979 of the five-year contract challenged in this suit.

Plaintiff instituted the present action on April 9, 1979. On cross-motions for summary judgment supported by voluminous affidavits and supporting documents, the trial court, on May 17, 1979, granted defendants' motions. Preliminarily, it ruled that plaintiff had, as the court characterized it, standing to raise the

---

[2]The TIM 300 system permits racing patrons to go to any window to place wagers of any amount between $1 and $250 in any betting pool in any race to be run that day, and also permits such patrons to cash current or previous day's winning tickets at any window under the complete control of the computer. This system eliminates the need for separate windows for selling different wager types and amounts and separate windows for the cashing of tickets.

public bidding issue despite the fact that it had negotiated its existing totalisator system contract with the Authority without any public bidding. On the merits, the court found that this type of computer service contract was a combination of equipment and services and held that the matter fell within the "professional services" exception to the requirement of public bidding contained in *N.J.S.A.* 5:10–21.

The Appellate Division, in an opinion reported at 171 *N.J.Super.* 480 (1979), reversed and ordered that judgment be entered in favor of plaintiff invalidating the Amtote contract and requiring that public bidding be conducted for a new contract which was to go into effect September 1, 1980. It agreed with the trial court that plaintiff could maintain suit, and that the Amtote contract involved both equipment and services. The panel concluded, however, that the services called for by the contract did not "fall within the ambit of the professional services exemption, and that the public bidding requirement should have been followed." *Id.* at 491. Certification was granted by this Court, 84 *N.J.* 428 (1980), and, on defendants' motions, the judgment of the Appellate Division was stayed. We now reverse the Appellate Division and reinstate the judgment of the trial court.

■ We deal first with the question whether Autotote is estopped from maintaining the present suit. Plaintiff had entered into a contract with the Authority to provide a totalisator system and services at the Meadowlands for a three-year period commencing September 1, 1976. This contract was awarded without public bidding. One of the reasons given for this decision was that the major portions of the contract related to services of a technical and professional nature. During the course of this contract, Autotote negotiated with the Authority concerning the furnishing of the more sophisticated cash/sell totalisator system. These negotiations were terminated when the Authority concluded that Autotote's prototype machines, installed at the Meadowlands on a trial basis, were unreliable.

It seems clear, though, that had the demonstration system worked satisfactorily, Autotote was prepared to negotiate a new contract without public bidding.

The abrupt "about-face" in Autotote's attitude toward public bidding after Amtote was awarded the contract for the cash/sell system raises the question whether Autotote's past conduct estops it from challenging the award to Amtote. In *Waszen v. City of Atlantic City*, 1 *N.J.* 272 (1949), this Court ruled that an unsuccessful bidder for a garbage removal contract did not have standing to challenge the award of the contract to another bidder on the ground of allegedly illegal specifications. The rationale of the holding was that "one cannot endeavor to take advantage of a contract to be awarded under illegal specifications and then, when unsuccessful, seek to have the contract set aside." 1 *N.J.* at 276. Plaintiff's dealings with defendant Authority fall within this category. Although *Waszen* spoke in terms of standing to bring suit, the better way to state the rule is to say that a party is estopped from challenging the award of a contract which it actively sought through the same procedures it now attacks.

We are concerned, however, with a statutory provision as to which there has been a paucity of judicial attention. The issue is one of substantial public importance and large sums of public monies are at stake. The substantive issue before the Court has been fully developed by both parties and there is a strong likelihood that it would be raised again in the near future if we were to decline to reach it. Since the question is ripe for judicial resolution and since a decision on the public bidding issue will serve the public interest, we address the merits of plaintiff's argument.

We begin by reaffirming the strong public policy underlying the public bidding statutes. In *Terminal Constr. Corp. v. Atlantic Cty. Sewerage Auth.*, 67 *N.J.* 403 (1975), this policy was set forth as follows:

> Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. [*Id.* at 409–410]

In this same vein, it is axiomatic that statutory exceptions to public bidding requirements should be strictly construed so as not to dilute this policy or permit a public body to avoid pertinent legislative enactments. See *Pucillo v. Mayor and Council of Borough of New Milford*, 73 *N.J.* 349, 356 (1977).

Against this background we consider the Amtote cash/sell totalisator system and services called for under the February 23, 1979 contract. As previously noted, the TIM 300 system permits racetrack patrons to place wagers and to cash winning tickets at any window. The system provides a high wagering capacity in the vital moments just prior to the start of races when the majority of wagers are placed. In operation, the system has demonstrated major savings in the cost of racetrack operations. Its speed of operation provides substantial additional revenues by allowing more bets to be placed in the "finite time" before each race. Since the Authority was seeking an up-to-date totalisator system able to maximize revenues, efficiency and convenience while keeping costs down, the system offered by Amtote fulfilled its needs.

It is undisputed that the TIM 300 totalisator system is highly sophisticated computer equipment needing specially trained personnel to operate it and constant supervision to avoid malfunction. To that end the contract requires Amtote

> [t]o furnish an adequate staff of technicians to service and maintain the System in good and accurate operating condition during every day on which totalisator services are provided pursuant to the terms of this Agreement. The function of such technicians shall be to maintain proper operational control of the System and in the event they encounter unusual operating conditions, to promptly restore the System to its normal standard.

We are informed that in fulfilling its contractual obligations, Amtote currently maintains a staff of 12 technicians and 4 operators at the Meadowlands under the charge of an experienced Systems Manager with backup engineers in Maryland on

call to deal with problems which the local Amtote staff are unable to solve.

■ It is unnecessary to spell out all of the highly technical details of the equipment and services. We conclude that the contract in question involves the inextricable integration of a sophisticated computer system and services of such a technical and scientific nature as to constitute "professional services" within the statutory exception to the requirement of public bidding, *N.J.S.A.* 5:10–21.

■ This particular statutory provision has not been previously construed, and other public bidding statutes with a professional services exception have received limited judicial attention. Further, we do not find the legislative definitions of "professional services" in another of our public bidding statutes, the Local Public Contracts Law, *N.J.S.A.* 40A:11–2, to be helpful in our attempt to ascertain the scope of the exception in *N.J.S.A.* 5:10–21, despite the Appellate Division's heavy reliance on them. See 171 *N.J.Super.* at 490–491. However, it is clear that the term "professional services" is no longer limited to the traditional professions such as law and medicine. See *Abelson's Inc. v. N. J. State Board of Optometrists*, 5 *N.J.* 412, 419 (1950). If the law is to keep pace with scientific developments in business and commerce, it must adapt statutory provisions, such as the one in question, to the realities of the day. See, *Waste Management v. Wis. Solid Waste, etc.*, 84 *Wis.*2d 462, 267 *N.W.*2d 659 (Sup.Ct. 1978).

■ The contract under review calls for both equipment and services. These services are not limited to standby personnel who are called upon to act only in case of malfunction. The system needs specially trained technicians to supervise day-to-day operations. Without them, the system could not function. In a somewhat similar situation, the Supreme Court of New York, Appellate Division, in *American Totalisator Co., Inc. v. Western Reg'l Off-Track Betting Corp.*, 44 *App.Div.*2d 750, 396 *N.Y.S.*2d 301 (1974), ruled that totalisator services constituted

professional services not subject to New York public bidding statutes. In so ruling, it stated: " 'It would be an unreasonable and mischievous construction of the statute, to apply it to services which require in their proper performance scientific knowledge or professional skill.' " 396 *N.Y.S.2d* at 302 (quoting *People ex rel. Smith v. Flagg*, 17 *N.Y.* 584, 587 (1858)). We agree with this decision as well as with the ruling by the Wisconsin Supreme Court in *Waste Management, supra*, which applied a "scientific knowledge and professional skill" exception to competitive bidding requirements and upheld the award of a negotiated contract for the design, construction and operation of a solid waste recycling facility.

The Amtote contract can also be sustained under another exception contained in the Sports and Exposition Authority Law. This provides that the provision for public bidding shall not apply when "the public convenience require[s]" otherwise. N.J.S.A. 5:10–21. After the Authority decided on the need to change to a cash/sell totalisator system, it installed Autotote demonstration machines at the Meadowlands in late 1978. As has been noted, however, the demonstration failed, causing great inconvenience and confusion to Meadowlands' patrons.

The Authority was then faced with the necessity of securing a reliable cash/sell totalisator in time for the opening of the September 1979 racing season. Its negotiations with Amtote were on this basis. The TIM 300 system, a proven, operational system containing all the features heretofore mentioned, fulfilled all of the Authority's requirements. It satisfied the need to have the best system available. It was of tried reliability, thereby minimizing possible disruption of the track's operations and the resultant inconvenience and confusion to patrons. Because of its sophistication and efficiency it offered major savings in the cost of track operations and at the same time provided substantial additional revenues. In view of these circumstances, we conclude that, under the "public convenience" exception contained in the statute the Authority was authorized

to dispense with public bidding and negotiate a contract for the needed equipment and services.

It may well be that the totalisator field will develop to such a degree of standardization and reliability that the services provided will become routine. In view of this possibility, and in the interest of avoiding future controversies, the Authority may wish to re-evaluate the feasibility of accepting public bids on future totalisator contracts. We make this observation being aware that both the Lottery Commission (computer systems contract for state lottery) and the Authority itself (contract for photo-finish photography services) have recently made successful use of the public bidding process in the letting of large-scale equipment/services contracts for their respective agencies. We merely hold that, in the rapidly developing totalisator field as existed in 1979, the services to be provided under the Amtote contract called for such a degree of technical knowledge and professional skill as to bring the contract within the "professional services" exception to the bidding requirement. We also hold that, under the circumstances presented at the time, the award of the contract to Amtote without public bidding was authorized under the "public convenience" exception.

Reversed.

PASHMAN, J., concurring.

I agree that the Authority was not required to solicit public bids for the totalisator system at the Meadowlands racetrack. As the majority holds, the contract for this system was exempt from the public bidding requirement under both the "professional services" and the "public convenience" exceptions of *N.J.S.A.* 5:10–21. Because I believe that the majority understates the significance of the "public convenience" exception in this case, I write separately to clarify the meaning of that exception.

In particular, I would avoid any suggestion that the applicability of the "public convenience" exception depends upon the pressures of time, *ante* at 372. An inference one could draw

from the majority's reasoning is that the public convenience exception is not significantly different from the provision of the statute which excuses public bidding when "the exigency of the Authority's service will not admit [it]." Such an interpretation blurs the distinction between the two exceptions and fails to give full weight to the "public convenience" exception expressly created by the Legislature.

That exception, which also appears in *N.J.S.A.* 27:12C–11.1 (public bidding by New Jersey Expressway Authority) and *N.J. S.A.* 27:23–6.1 (public bidding by New Jersey Turnpike Authority) is nowhere defined in our law. It is clear, however, that the fundamental inquiry must be the *public* convenience—that is, how the interest of the public, not that of the governmental entity or any other individual party, will best be served. "Public convenience" is emphatically *not* a loophole to enable agencies to avoid otherwise operative public bidding requirements merely because it will be easier not to solicit bids. Situations will be rare indeed when reliance on this exception will be justified. This case presents one of those situations.

There are two "publics" whose convenience is at issue here. One consists of the thousands of patrons who bet at the racetrack each day. The other is the people of New Jersey who benefit from the accrual of racetrack revenues as well as from public bidding. The interests of both will be served best if the most reliable totalisator system is used at the track. Reliability is so important to the success of operations at the track and, hence, to the "public convenience," that selection of the totalisator system in 1978 could not have been subjected to the even limited uncertainties of public bidding.

No one disputes that the totalisator system is vital to the operations of the racetrack. Betting is the business of the track, and the totalisator system is the linchpin of the track's betting operations. Any failure or malfunctioning of the totalisator system would disrupt betting and greatly inconvenience the patrons of the track. Furthermore, from the perspective of the

people of the State, such malfunctioning would result not only in substantial lost revenues in the short term, but in the even more damaging long term loss of the good will of the betting public, with consequent loss of money to the State. The "public convenience" includes some assurance that the success of betting operations at the track will not be jeopardized by incurring unnecessary risk of such malfunctioning. However, just this risk would have been created if the Authority had to install any but the best and most reliable totalisator system available.

It seems so obvious as hardly to bear stating that the procurement of a totalisator system is a totally different matter from awarding a contract for such things as, for example, conventional maintenance or technical services. In these latter situations, less than optimal services will not threaten the foundations of the track's operations and can gradually be corrected without any serious inroads on the "public convenience." In striking contrast to a conventional maintenance or service contract, solicitation of public bids on a totalisator system, even the briefest failure of which might be disastrous, was simply inappropriate in 1978 when the Authority sought the contract. The Legislature allowed for this fact by including a "public convenience" exception in the applicable public bidding statute.

The dissent suggests that the Authority could have adequately protected the public convenience by drafting detailed specifications and awarding a contract only to the lowest *responsible* bidder. *Post* at 381. This argument overlooks the difficulty of gauging the reliability of a highly complex totalisator system simply by reference to the specifications. Each bidder would attest to the reliability of its system and to the fact that the system meets the Authority's requirements. Since reliability of the totalisator is critical to the racetrack's operations, however, the Authority could not depend on the bidder's assurances. Under the circumstances of this case, the Authority could acquire objective evidence of a system's reliability in only two ways. It could either give the product a trial, which in this case proved to be detrimental to the public interest when the system

failed, or choose a totalisator system that had demonstrated its reliability in actual use elsewhere—the course ultimately followed by the Authority here.

It is also highly significant that the Legislature has very sparingly authorized such an exception to the general requirement of public bidding. Only the statutes applicable to the Sports Authority, the Expressway Authority and the Turnpike Authority contain the public convenience exception. It is not included in the law governing public bidding by municipalities and other governmental units generally. *N.J.S.A.* 40A:11–1 *et seq.* One reason for the difference in the public bidding statutes of these three authorities is that the Legislature confirms the appointment of their members.[1] Consistently with the greater control it exercises, the Legislature plausibly decided that it could safely give these authorities the discretion to decide when public bidding on a particular contract would not suit the "public convenience."

I could not agree more with the majority (and the dissent, for that matter) that compelling policy considerations underlie the public bidding statutes and that exceptions to these statutes must be narrowly construed. *Ante* at 369. This does not mean, however, that the exceptions should be read out of the statute or that courts should prohibit the exercise by the Authority of its statutorily conferred power not to solicit public bids on the rare contracts where, as in this case, the public convenience requires otherwise.

SCHREIBER, J., dissenting.

The "strong public policy underlying the public bidding statutes," *ante* at 369, with its necessary corollary that "statutory exceptions to public bidding requirements should be strictly

---

[1] *N.J.S.A.* 5:10–4(b) (membership of Sports & Exposition Authority); *N.J.S.A.* 27:12C–5 (membership of Expressway Authority); *N.J.S.A.* 27:23–3(B) (membership of Turnpike Authority).

construed," *ante* at 370, two principles enunciated by the majority, when applied to the facts of this case, compel the conclusion that public bidding is in order here. .

The statute governing the New Jersey Sports and Exposition Authority provides that:

... no contract on behalf of the authority shall be entered into for the doing of any work, or for the hiring of equipment or vehicles, where the sum to be expended exceeds the sum of $2,500.00 unless the authority shall first publicly advertise for bids therefor, and shall award the contract to the lowest responsible bidder; provided, however, that such advertising shall not be required where the contract to be entered into is one for the furnishing or performing services of a *professional* nature .... [*N.J.S.A.* 5:10–21; emphasis supplied]

This bidding statute is to be "construed as nearly as possible with sole reference to the public good." *Terminal Constr. Corp. v. Atlantic Cty. Sewerage Auth.*, 67 *N.J.* 403, 409–410 (1975). Accordingly, we have held that the public good is best served by curtailing "the discretion of local authorities by demanding strict compliance with public bidding guidelines." *Pucillo v. Mayor and Council of Borough of New Milford*, 73 *N.J.* 349, 356 (1977). There can be no doubt that the exception from public bidding in *N.J.S.A.* 5:10–21, "services of a professional nature," should be strictly construed.

The statute does not define "services of a professional nature" and we must therefore seek assistance elsewhere. There has been a paucity of litigation on what constitutes professional services, probably because until today it was understood to have referred to services of a character involving "peculiar professional education and experience." *Heston v. Atlantic City*, 93 *N.J.L.* 317, 320 (Sup.Ct.1919). Thus it has been held to include an engineer, *Franklin v. Millville*, 98 *N.J.L.* 262 (E. & A.1922), an accounting auditor, *Heston v. Atlantic City*, 93 *N.J.L.* 317 (Sup. Ct.1919), a physician, *Auerbacher v. Smith*, 19 *N.J.Super.* 191, 195 (Ch.Div.1952), an attorney, *In re Rothman*, 12 *N.J.* 528, 548 (1953), and an architect, *Furlong v. Housing Auth. of Newark*, 132 *N.J.Eq.* 341, 343 (Ch.1942). It has never been held to include services of skilled mechanics or technicians. *Cf. Burlington Tp. v. Middle Dep't Inspection Agency*, 175 *N.J.Super.* 624 (Law Div.

1980) (inspection of electrical equipment not a professional service).

Some guidance as to what the Legislature meant by professional services may be found in the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 *et seq.*, setting forth competitive bidding requirements for municipalities and counties. This was enacted about the same time as the New Jersey Sports and Exposition Authority Law.

Both statutes have the same basic purposes in providing for competitive bidding for public contracts and in excepting therefrom "professional services." Therefore it is appropriate to examine the exception in one to determine the extent of the exception in the other. It is reasonable to assume that the Legislature intended that the extent of the professional service exemption be the same in both areas. If the legislative intent had been otherwise, one would expect some express language so indicating. 2A *Sutherland, Statutory Construction* (4th ed. 1973), § 51.02 at 290; *cf. Galloway Tp. Bd. of Ed. v. Galloway Tp. Ed. Ass'n*, 78 *N.J.* 1, 10 (1978) (where an analogous federal statute used to ascertain meaning of statutory language); *Gorton v. Reliance Insurance Co.*, 77 *N.J.* 563 (1978).

Under the Local Public Contracts Law "professional services" are expressly excepted from competitive bidding.[1]  *N.J.S.A.* 40A:11–5. Professional services are defined as those "performed by a person authorized by law to practice a recognized profession, whose practice is regulated by law, and the performance of which services requires knowledge of an advanced type in a field of learning acquired by a prolonged formal course of specialized instruction and study as distinguished from general

---

[1]Also excepted are "extraordinary, unspecifiable services." These are services "specialized and qualitative in nature requiring expertise, extensive training and proven reputation in the field of endeavor." *N.J.S.A.* 40A:–11–2(7). The Legislature chose not to expand the exceptions in the New Jersey Sports and Exposition Authority Law to include extraordinary unspecifiable services.

academic instruction or apprenticeship and training." *N.J.S.A.* 40A:11–2(6).

Under the contract between American Totalisator Company, Inc. and the Authority, the Company agreed to lease and install a computerized pari-mutuel totalisator system. The Company was also obligated to maintain the system throughout the lease period. To that end the Company contracted "[t]o furnish an adequate staff of *technicians* to service and maintain the System in good and accurate operating condition." (emphasis supplied). If the Authority believed the staff of technicians was inadequate, then the Company would furnish three individuals, one of whom would be a systems manager with at least three years' experience and one a totalisator technician with at least one year's experience. Only servicing and maintaining the System were required after installation of the hardware and the programming. Nowhere in the contract were these services described as professional.

Services of this nature do not fall within the category of professional services. For example, not one of the three definitional requisites under the Local Public Contracts Law is met or satisfied by these technicians. Holding that specially trained personnel who operate sophisticated computer equipment provide professional services broadens that concept, contrary to the basic principle that a narrow construction be applied to that exception from public bidding. It disserves the public interest and opens the door to an escape from competitive bidding for a wide range of services of highly skilled technicians.

Moreover, application of the exception to this equipment leasing contract fails to recognize that a substantial part of the cost was attributable to the equipment, not the maintenance services. It is undisputed that specifications covering the equipment could be drawn. The public bidding statute is avoided by combining some maintenance services with the lease of the equipment. A recent Supreme Judicial Court of Massachusetts decision, *Datatrol, Inc. v. State Purchasing Agent*, 400 *N.E.2d*

1218 (Mass.1980), refused to succumb to that technique and should serve as an apt precedent for us today.

The Massachusetts State Lottery Commission, after negotiation, entered into a contract with the American Totalisator Company to furnish and service a highly sophisticated electronic data processing system for handling betting on various games with 300 to 500 terminals at various locations. A competitor, Datatrol, attacked the validity of the contract for violation of competitive bidding requirements. The Massachusetts court found that competitive bidding was applicable. It held that leases for equipment were subject to competitive bidding; otherwise long-term leases could be used "to evade the competitive bidding requirement." *Id.* at 1227.[2]

Nothing in the legislative history indicates an intent to exempt from competitive bidding the type of contract in this case—leasing and maintenance of equipment. It is for the Legislature to decide whether there is a desire and need "to

---

[2]The majority's reliance upon *Waste Management v. Wis. Solid Waste, etc.*, 84 *Wis.*2d 462, 267 *N.W.*2d 659 (Sup.Ct.1978), is misplaced. The statute there, ch. 499, excepted from competitive bidding those services enumerated in Section 499.07(27). The Wisconsin Supreme Court quoted this exception:

"To contract for services in the performance of architectural and engineering design, the supervision of design and construction, system management and facility management; *and for such other professional or technical services as may require either prequalification of a contractor or the submission by any person of a proposal in response to an official request for proposal or similar written communication of the authority*, whenever such services are, in the discretion of the authority, deemed necessary, desirable or convenient in carrying out the purposes of the authority." [267 *N.W.*2d at 664; emphasis supplied by the court] *American Totalisator Co. v. Western Reg. Betting Corp.*, 44 *App.Div.*2d 750, 396 *N.Y.S.*2d 301 (1974), also relied upon, concerned a contract exclusively for computer services and involved a statute requiring competitive bidding "for construction or any other work." The opinion discusses, in dictum, what the legislature intended to be included in "work." The New York statute does not contain any exception like that in the New Jersey statute of "services of a professional nature." Everyone assumes that absent this exception (none of the other express statutory exceptions being applicable), the agreement would be subject to competitive bidding.

keep pace with scientific developments in business and commerce," *ante* at 371, so as to exempt contracts of this type from competitive bidding. Moreover, no contention is made that adequate bid specifications could not have been prepared and submitted.

The statute authorizes the Authority to enter into contracts without competitive bidding where the "public convenience" or an "exigency" so requires. The majority claims that the pressing time constraints justified invoking the "public convenience" exception. However, there was no showing that in October 1978 competitive bidding was not feasible. Even if there may have been some additional delay so that the system may not have been installed by September 1979, the situation was not so desperate as to warrant avoidance of competitive bidding. Moreover, the requirement of *N.J.S.A.* 5:10–21 that the Authority adopt a resolution reciting that such an exigency existed was not satisfied. Indeed, this "public convenience" argument was not advanced by the Authority until the contention appeared in its brief filed with this Court.

The concurring opinion's definition and application of "public convenience" fails to recognize that the plans and specifications of the system were to be determined by the Authority. Public competitive bidding would be open to all, and not limited to Autotote Limited and the American Totalisator Company. Moreover, the Authority must award the contract not simply to the lowest bidder, but the lowest *responsible* bidder. To read the statutory exception in the broad manner suggested would substantially impair the public good safeguarded by public competitive bidding.

I would affirm the judgment of the Appellate Division invalidating the negotiated contract.

PASHMAN, J., concurring in the result.

For *reversal*—Justices SULLIVAN, PASHMAN, CLIFFORD and POLLOCK—4.

For *affirmance*—Justice SCHREIBER—1.