LASSER, P.J.T.C.
In this action, Atlantic City Electric Co. contests a sales and use tax deficiency assessment levied by the Director pursuant to N.J.S.A. 54:32B-1 et seq. The issue before the court is whether taxpayer’s leases of railroad tank cars to transport oil to its electrical generating plant are exempt from sales tax under N.J.S.A. 54:32B-8(m)(2).[1] All other issues in this action having been disposed of by agreement of the parties, it is agreed that as to these other issues, the complaint is to be dismissed.
N.J.S.A. 54:32B-8(m)(2) exempts from sales and use tax “Sales of machinery, apparatus or equipment for use or con *556 sumption directly and primarily in the production, generation, transmission or distribution of gas, electricity, refrigeration, steam or water for sale or in the operation of sewerage systems.” The parties have stipulated the facts and have submitted the legal issue for disposition.
The stipulated facts are as follows: Atlantic City Electric Co. (hereinafter taxpayer) is a regulated public utility engaged in the production, generation, transmission and distribution of electrical energy for public use in southern New Jersey. Taxpayer owns and operates at Beesley’s Point in Cape May County an electrical generating station which uses no. 6 fuel oil to produce steam to turn its turbine-generators. This oil is delivered by ship or barge to the Mantua fuel terminal in Paulsboro, New Jersey, on the Delaware River and is transported from there by railroad 67 miles to taxpayer’s Cape May generating station. This generating station has a storage tank capacity of 11,480,000 gallons. Stored oil is piped from these storage tanks to the generating unit boilers which produce the steam to drive the turbine-generators that produce electricity.
When the generating units are in operation, an average of three or four trains, each consisting of twenty tank cars, deliver 1,764,000 gallons of fuel oil each week. Each tank car has a capacity of approximately 22,550 gallons, and each twenty-tank-car train carries approximately 430,500 gallons of fuel oil. When the generating station is operating at 88% of capacity, its weekly consumption of fuel oil is approximately 1,720,000 gallons. Conrail supplies the locomotives, the train crew and the tracks. Conrail did not supply tank cars for the transportation of oil during the audit period and does not do so at the present time. Under the agreement between taxpayer and Conrail, taxpayer must furnish these tank cars.
The ship or barge that delivers the fuel oil to the Mantua fuel terminal is usually equipped with heating devices to maintain the oil at a temperature of approximately 130°F, as specified in taxpayer’s contract with the oil supplier. The oil must be maintained at this temperature to facilitate pumping. It be *557 comes difficult to pump if the temperature falls below 100°F, and cannot be pumped at all if the temperature falls below 80°F. Accordingly, the oil is delivered to Mantua at 130°F and pumped into tanks which are also heated to maintain the oil’s temperature at 130°F. The railroad tank cars used to transport the fuel oil to taxpayer’s generating station must be insulated and equipped with exterior steam-heating coils to maintain the temperature of the oil at 130°F. When the tank cars arrive at the generating station, the oil is pumped into storage tanks which are also heated. On occasion, the off-loading of oil is delayed, and in that event, the tank cars are connected to an auxiliary steam system located at the unloading site to continue heating the oil at 130°F until off-loading can take place.
Taxpayer contends that its rental payments are exempt from sales tax because they are payments for the lease of equipment used “directly and primarily in the production, generation, transmission or distribution of ... electricity.” N.J.S.A. 54:32B-8(m)(2). In the alternative, taxpayer contends that (1) the rentals are exempt from sales tax under N.J.S.A. 54:32B-8(g)[2] as part of the cost of fuel delivered to consumers in bulk, and (2) the receipts are exempt under N.J.S.A. 54:32B-8(k)[3] because they are part of the cost of transporting fuel burned at a utility generating station to produce electricity.
Rentals are included in the definition of “sales” in N.J.S.A. 54:32B-2(f). The Director contends that payments for the rental of railroad tank cars are subject to sales tax because the Sales and Use Tax Act, N.J.S.A. 54:32B-1 et seq., imposes a tax on all sales of tangible personal property and the lease transactions are not exempt under the sections cited by taxpayer.
The general rule of interpretation of tax exemptions is that such exemptions are to be strictly construed, because an exemption from taxation is a departure from the equitable *558 principle that everyone should bear his just and equal share of the public tax burden. Taxation is the rule, and exemption is the exception to the rule. The legislative design to release one from his just proportion of the public burden should be expressed in clear and unequivocal terms. Board of National Missions v. Neeld, 9 N.J. 349, 353, 88 A.2d 500 (1952). The burden is upon the claimant to clearly bring himself within an exemption provision. Ibid. Tax exemptions are not favored, and doubts are to be resolved against one claiming the exemption. Bloomfield v. Academy of Med. of New Jersey, 87 N.J.Super. 595, 210 A.2d 420 (App.Div.1965), rev’d on other grounds 47 N.J. 358, 221 A.2d 15 (1966). It must be noted, however, that strict construction does not require a rigid interpretation that does not serve the apparent legislative purpose; rather, a statute is to receive a reasonable construction. Alexander v. N.J. Power and Light Co., 21 N.J. 373, 378, 122 A.2d 339 (1956). This qualification of reasonableness, however, does not negate a constructional preference for the taxation of property. Container Ring v. Taxation Div. Director, 1 N.J.Tax 203, 208 (Tax Ct.1980), aff’d o.b. 4 N.J.Tax 527 (App.Div.1981), certif. den. 87 N.J. 416, 434 A.2d 1090 (1981).
For the rental of railroad tank cars to be exempt under § 8(m)(2) they must be used directly and primarily in the production and generation of electricity. The court is thus called upon to answer the question, when does production or generation begin? Even by the broadest definition, production and generation cannot be deemed to begin before the fuel oil arrives at the generating station. The railroad tank cars are used primarily and directly in the transportation of fuel oil. They cannot be regarded as being used primarily and directly in the production and generation of electricity.
Taxpayer argues that although there are no New Jersey cases directly on point, the decision by the Ohio Supreme Court in Cleveland Elec. Illuminating Co. v. Lindley, 69 Ohio St. 2d 71, 430 N.E.2d 939 (Sup.Ct.1982), supports taxpayer’s position. In that case the electric utility leased gondola railroad cars to *559 transport coal to its Ohio generating station from mines located in Pennsylvania, Kentucky and West Virginia. The Ohio Sales and Use Tax Act exempts transactions in which the purpose of the consumer is to “use or consume the thing transferred ... directly in the rendition of a public utility service.” R.C. 5739.01(E)(2). The statute defines this phrase as “that property which is to be incorporated into and will become a part of the consumer’s production, transmission, transportation or distribution system and which retains its classification as tangible personal property after such incorporation; fuel or power used in production, transmission, transportation or distribution; and tangible personal property used in the repair and maintenance of the production, transmission, transportation or distribution system, including only such motor vehicles as are specially designed and equipped for such use.” R.C. 5739.01(Q)
The Ohio court stated that the coal cars were “incorporated into and used as part of a vital or essential step in the production process.” 430 N.E.2d at 941. The court held that delivery of coal was essential to continuous production of electricity and that, therefore, the coal cars were used directly in the rendition of a public utility service.
The New Jersey statute differs from Ohio’s in that it does not exempt the “system,” and it is clear that New Jersey’s exemption is narrower than that in the Ohio statute. The New Jersey exemption requires equipment to be used directly and primarily in production and generation. Production and generation begin at the generating station. There is no indication in the New Jersey statute that activities which occur off-site are intended to be exempt even if they may be essential to production.[4] If an essentiality test were adopted, as taxpayer urges, there would be little reason to stop at the railroad tank cars because all equipment in the chain back to the wellhead could *560 be considered essential to the production of electricity. Similarly, equipment not directly used in production, such as office furniture and equipment, would be included on the ground that it is essential to production.
Taxpayer also relies on Niagara Mohawk Power Corp. v. Wanamaker, 286 App.Div. 446, 144 N.Y.S.2d 458 (App.Div.1955), aff’d 2 N.Y.2d 764, 157 N.Y.S.2d 972, 139 N.E.2d 150 (Ct.App.1956), which held that a crane and car dumper which unloaded incoming coal, the conveyer belt which moved the coal to the boiler, and a narrow gauge railway that carried the ash and slag away from the boiler were all “directly and exclusively” used in the production of electricity and were exempt from sales tax. In Niagara Mohawk the court held that it was not practical to divide a generating plant into distinct stages. The court found that the entire plant was built as an integrated generating plant and operated that way. Further, the court was concerned with the problem of multiple taxation because, unlike New Jersey, New York imposes a sales tax on the sale of electricity. The court indicated that its task was to “strike a balance between the policy of avoiding multiple taxation and the need for revenue raising.” 144 N.Y.S.2d at 461. Niagara Mohawk is distinguishable from the subject case in that the New York case dealt only with on-site equipment and the court was concerned with multiple taxation.
Taxpayer also relies on Millington Quarry, Inc. v. Taxation Div. Director, 5 N.J.Tax 144 (Tax Ct.1983), which exempted trucks and excavating equipment used to remove rock from the quarry cliff face and transport it to the rock crusher, holding that this equipment was used directly and primarily in the refining process (converting rock into gravel). The quarry equipment was found to be exempt under N.J.S.A. 54:32B-8.-13a, a section which exempts equipment for “use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining.” The Millington quarry equipment differs from the subject equipment in that it was used on-site as a part of the production process.
*561 The Director has promulgated a regulation under § 8(m)(l) (exemption of manufacturing machinery and equipment) which defines “directly and primarily.” N.J.A.C. 18:24-4.4.[5] The regulation states that “equipment is to be considered directly used in production only when it is used to initiate, sustain or terminate the transformation of raw materials into finished products.” N.J.A.C. 18-24-4.4(c). It states that consideration must be given to the physical proximity of the equipment to the production process, the proximity of time of use and the causal relationship between the use of the property and production of the product. N.J.A.C. 18:24-4.4(e). The regulation specifically states that “The fact that particular property may be considered essential to the conduct of manufacturing, processing, assembling or refining because its use is required either by law or by practical necessity does not, of itself, mean that the property is used directly in manufacturing, processing, assembling or refining.” N.J.A. C. 18:24-4.4(c)3.
There are no regulations promulgated under § 8(m)(2). However, subsections (1) and (2) use parallel language in granting exemption to equipment for use or consumption directly or primarily in production. If the test of this regulation were applied to the § 8(m)(2) exemption, it would lead to the conclusion that equipment that initiates or sustains production is that which is used on-site, and does not include equipment used off-site to deliver raw materials or fuel to the generating station for use in the production and generation process. A common sense interpretation of the words “directly and primarily” in paragraph (m)(2) leads to the conclusion that equipment used off-site for transportation of materials to the production site is not used directly and primarily in production.
*562 Transportation of raw materials and fuel to a production site is always essential to production. If the Legislature had intended that equipment used in transportation to a production site be exempt, it would have so stated in § 8(m). However, to the contrary, that section states: “The exemption granted under this section shall not be construed to apply to sales, otherwise taxable, of machinery, equipment or apparatus whose use is incidental to the activities described in paragraphs (1), (2) and (3) of this section.” N.J.S.A. 54:32B-8(m)(3).
Taxpayer argues that if it had chosen to use over-the-road tank trucks instead of railroad tank cars to transport the fuel, the purchase or rental of those trucks would be exempt under N.J.S.A. 54:32B-8(ff).[6] Similarly, if the fuel oil were transported in Conrail’s own railroad tank cars, that transportation would be exempt under N.J.S.A. 54:32B-8(k)[7] and, under N.J. S.Á. 54:32B-8(bb),[8] there would be no sales tax on a lease if Conrail leased the railroad tank cars directly from GATX. The stipulation of facts states that “Conrail did not supply tank cars for the transportation of oil or chemicals during the audit period, and does not do so at the present time.” Whether Conrail would supply these tank cars and whether the oil could be transported to the generating station in another manner are not relevant to the inquiry. The method actually utilized by taxpayer is the focus of inquiry, General Trading Co. v. Taxation Div. Director, 83 N.J. 122, 416 A.2d 37 (1980), and that method is specifically taxable under the Sales and Use Tax Act and does not come within the exemption.
Taxpayer’s argument that taxation of the rental of railroad tank cars imposes an additional tax burden on an already heavily taxed utility is an argument that should be addressed not to this court but to the Legislature.
*563 Taxpayer contends that railroad tank car rental payments come within the exemption for receipts from the sale of fuel delivered to consumers in bulk which is contained in N.J.S.A. 54:32B-8(g). Taxpayer argues that no sales tax should be imposed either on the purchase of the oil or on its delivery because the tank car rentals are a part of the cost of the fuel. If the fuel oil supplier had delivered the fuel, the transportation charge would be exempt from sales tax under § 8(k). The parties stipulated that the board of public utilities requires taxpayer to include transportation costs as part of fuel costs for accounting and rate-setting purposes. Even though transportation costs may be regarded by the board of public utilities as a part of the cost of fuel, the rental of the railroad tank cars is separate from the cost of fuel and is separately taxable under the statute. The fact that they may be viewed as a part of fuel costs or be required to be accounted for as such by the board of public utilities does not change the character of these payments for sales and use tax purposes.
I conclude that rentals of railroad tank cars used to deliver fuel oil to taxpayer’s generating station are taxable under the Sales and Use Tax Act. The Clerk of the Tax Court is directed to enter a judgment affirming the assessment.

 N.J.S.A. 54:32B-8(m)(2) was repealed in 1980 and replaced with the current statute, N.J.S.A. 54:32B-8.13b. L. 1980, c. 105, § 25, eff. Sept. 11, 1980. The wording of the new statute is identical to that of the old.

 Now, N.J.S.A. 54:32B-8.7.

 Now, NJ.S.A. 54:32B-8.11.

 The heating of the oil to 130“F during the transportation process is for the purpose of assisting the handling and pumping of the oil, and the stipulated facts do not contain evidence that this heating is a part of the production process.

 N.J.A.C. 18:24-4.4 was deleted in 1973 because N.J.S.A. 54:32B-8(m)(l) was repealed by the Legislature in L. 1970, c. 7, § 5. 5 N.J.R. 246 (1973). N.J.A.C. 18:24-4.4 was restored in its present form, through section f(l), in 1977. 9 N.J.R. 544(a) (1977). Section g of the regulation was added in 1979. 11 N.J.R. 210(d) (1979).

 Now, N.J.S.A. 54:32B-8.31.

 Now, N.J.S.A. 54:32B-8.11.

 Now, N.J.S.A. 54:32B-8.27.