ANDREW, J.T.C.
This is a sales and use tax case in which plaintiff, GE Solid State, Inc., challenges a tax deficiency assessed by the Director of the Division of Taxation relative to purchases of photomask machinery and photoplates by plaintiffs predecessor, the Solid State Division of RCA Corporation, during the assessment period of July 1, 1981 through June 30, 1984.
Plaintiff claims the purchases were exempt from sales and use tax pursuant to an exemption provision in the Sales and Use Tax Act, N.J.S.A. 54:32B-1 et seq., for machinery, apparatus or equipment used in the production of tangible personal property at N.J.S.A. 54:32B-8.13a. Of course, the Director asserts that the purchases by plaintiffs predecessor did not meet the requirements of the exemption provision.
The facts in this proceeding were presented in an extensive stipulation supplemented by trial as to those areas in which the parties could not agree.
Plaintiff, GE Solid State, Inc., a Delaware corporation, with its principal place of business located in Somerville, New Jersey, is the successor in interest to RCA Corporation. During the assessment period at issue, the Solid State Division of RCA Corporation was engaged in, among other things, the business of manufacturing and selling integrated circuits or “chips.” Integrated circuits are rectangular transistor circuits made of silicon, several times smaller than a thumbnail, containing anywhere from 100 to 10 million transistors. The transistors *324 are all made directly on the chip and are connected together into a single circuit. The integrated circuit may have anywhere from 7 to 17 levels or layers of various elements.
The process which eventuates in integrated circuits, packaged and ready for shipment to plaintiff’s customers, can be separated into four phases. The first is research and development in which design engineers and layout designers, aided by a computer, create a prototype of the 7 to 17 levels of a proposed integrated circuit. The prototype consists of 7 to 17 photo-masks. A photomask is a four- or five-inch glass plate, called a photoplate, which is covered with layers of chrome, chrome oxide and photoresist, which after processing, contains the pattern of one level of the components of the integrated circuits. Once research and development develops a prototype set of 7 to 17 photomasks, the photomask set is sent to plaintiff’s manufacturing facility in either Findlay, Ohio or West Palm Beach, Florida to actually produce a number of integrated circuits for testing. If the “chips” are suitable for the intended purpose, the product design is considered ready for manufacture.
The second phase of plaintiff’s operations involves the production of photomasks which takes place in Somerville, New Jersey. The parties agree that photomasks are indispensable to the manufacturing of integrated circuits. As previously noted, the photomasks contain the patterns of the integrated circuits and are used, through a photographic-like pattern transfer process called photolithography, to transfer those patterns to a silicon wafer (which operation takes place in plaintiff’s third area of operations, i.e., silicon wafer manufacture or fabrication).
In its photomask operation, plaintiff produces four types of photomasks: (1) projection masters, (2) contact prints, (3) print masters and (4) reticles. Only the first two, projection masters and contact prints, are used in the third area of operations, i.e., *325 silicon wafer fabrication, to actually make integrated circuits.[1] The last two, print masters and reticles, remain in the photo-mask operation to produce additional projection masters and contact prints.
Before any discussion of plaintiffs photomask operation is offered, it is helpful to view the operation schematically.
[[Image here]]
In the photomask process, guided by a computer tape, the design of one level or layer of an integrated circuit is produced *326 on a photoplate by either a MEBES machine (an electron beam system) or a TRE machine (an optical exposure system) by means of either electron beams or optical exposure. After the plate is removed from either machine, it then goes through a number of chemical processes, the result of which is a finished photomask that contains the pattern of one level of an integrated circuit.
As the above schematic demonstrates, the MEBES machine produces three types of photomasks, i.e., projection masters, print masters and reticles. The projection master is sent to the operation known as silicon .water fabrication for actual production of the integrated circuits. The second type of photomask, a print master, is used in conjunction with a contact printer machine to make other photomasks called contact prints. The contact prints, like the projection masters, are used in the silicon wafer fabrication operation.
The third type of photomask produced by the MEBES machine is a reticle. A reticle is different from the other types of photomasks because the patterns on the reticle are ten times larger than actual size. The primary function of a reticle is to make other projection masters or print masters by means of a step-and-repeat machine. Reticles are not employed in the wafer fabrication operation, but instead, remain in plaintiffs photomask operation.
Next, as the above schematic diagram reveals, the TRE machine produces only reticles. In turn, however, as previously stated, a reticle, in conjunction with a step-and-repeat machine, can produce both print masters and projection masters. The print masters, as the schematic diagram demonstrates, can then be employed with a contact printer machine to produce contact prints. Again, only contact prints and projection masters are used in wafer fabrication while print masters and reticles are employed only in plaintiffs photomask operation.
As already noted, a set of 7 to 17 different photomasks is required in order to create all of the levels of an integrated circuit. Therefore, the MEBES machine or TRE machine pro *327 cess must be repeated 7 to 17 times in order to produce a photomask set to be used in the manufacture of one type of integrated circuit. Plaintiff does not sell any of its photomasks to other integrated circuit manufacturers.
The third area of plaintiff’s operations is the manufacture of the integrated circuit or wafer fabrication. Certain of plaintiff’s wafer fabrication operations are conducted at its facility in Somerville, New Jersey, the same location as its photomask operation. Most of plaintiff’s wafer fabrication operations, however, take place at its manufacturing facilities in Findlay, Ohio, Mountaintop, Pennsylvania and West Palm Beach, Florida.
According to the stipulation of facts submitted by the parties, the raw material of the integrated circuit is a small, usually four or five inches in diameter, round, thin wafer of silicon with layers of various materials such as aluminium. Wafer fabrication begins when the wafer is placed in a rinser-dryer machine. Thereafter, the silicon wafer makes its way into a printer machine of which the photomask is the most essential element. The photomask does not become a component part of the integrated circuit. Instead, through the printer, the designs or patterns on the photomasks are transferred to the silicon wafer which will contain the final integrated circuit.
After a number of additional procedures, one level of a particular photomask set is completely transferred to the silicon wafer. Inasmuch as each integrated circuit has 7 to 17 levels, the entire wafer fabrication process is repeated 7 to 17 times. At this point, the wafer is then checked for defects.
This brings the process to plaintiff’s fourth area of operations, that of packaging the units. The final phase of plaintiff’s operation is completed in its facilities in Taiwan, Malaysia and Somerville. In these facilities, the silicon wafers are diced into individual integrated circuits which are affixed into a ceramic or plastic package with bonding wires from the integrated circuit to the package and then sealed. After individual packaged *328 units are tested and approved, they are packaged and shipped to plaintiff’s customers.
At trial it was revealed that, during the assessment period at issue, plaintiff did not manufacture all of its own photomasks but had purchased some from outside sources which were used to manufacture integrated circuits. There was also testimony that another manufacturer of integrated circuits, Intel Corporation, also engaged in the practice of purchasing rather than manufacturing its own photomasks.
Plaintiff’s predecessor, the Solid State Division of RCA Corporation, filed timely sales and use tax returns with the Division of Taxation for the period of July 1, 1981 through June 30, 1984. On December 7, 1987, the Director issued a final determination, with respect to that period, that assessed a sales and use tax deficiency of $475,762. Plaintiff paid the entire deficiency, but contested the sum of $61,599 which is the subject of the present proceeding. Of the $61,599, $40,026 is attributable to a use tax imposed on plaintiff’s purchases of machinery and equipment used to make photomasks. The balance, $21,573, is attributable to a use tax assessment imposed on plaintiff’s purchases of photoplates used by plaintiff as reticles and print masters in its photomask operation to make other photomasks.
Plaintiff maintains that the machinery employed in its photo-mask operation, to fabricate photomasks, is used “directly and primarily in the production of tangible personal property by manufacturing,” and accordingly, is exempt from sales or use tax under N.J.S.A. 54:32B-8.13a. Plaintiff also contends that its purchases of photoplates, used solely as reticles and print masters in its photomask operation, are also exempt from sales or use tax. This contention is also based on N.J.S.A. 54:32B-8.-13 because, as plaintiff asserts, the reticles and print masters produced by its photomask operation constitute either: (1) machinery, apparatus or equipment “used directly and primarily in the production of tangible personal property by manufacturing” or, alternatively, (2) parts with a useful life of more than one year.
*329 As to plaintiffs first contention, the Director, in response, argues that the photomask machinery does not qualify for exemption because, first, the photomask machinery does not manufacture a product for sale and, second, the photomask machinery is not used “directly and primarily” in the production of the product that plaintiff does sell, i.e., integrated circuits.
In response to plaintiffs second contention, the Director maintains, first, that the photoplates purchased by plaintiff are not used directly and primarily in the production of a product for sale and, second, the photoplates do not qualify for exemption because they are not machinery, apparatus or equipment, nor are they parts having a useful life of more than one year.
I.

Is plaintiffs photomask machinery exempt from sales or use tax pursuant to the manufacturing exemption in N.J.S.A. 54.32B-8.13a. ?

The manufacturing exemption, N.J.S.A. 54:328-8.13 (hereinafter § 8.13), exempts from sales or use tax receipts from:
a. Sales of machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing assembling or refining.
The exemptions granted in this section shall not apply to ... parts with a useful life of one year or less____
In connection with this statute the Director promulgated a number of interpretive regulations. Among those were:
N.J.A.C. 18:24-4.2 Definitions
The following words and terms, when used in this subchapter, shall have the following meanings unless the context clearly indicates otherwise:
“Machinery, apparatus, or equipment” means any complex, mechanical, electrical or electronic devise, mechanism or instrument which is adapted to the accomplishment of a production process, and which is designed to be used, and is used, in manufacturing, converting, processing, fabricating, assembling, or refining tangible personal property for sale. [Emphasis supplied]
*330 N.J.A.C. 18:24-4.4
(b) Production is limited to those operations commencing with the introduction of raw materials into a systematic series of manufacturing, processing, assembling, or refining operations, and ceases when the product is in the form in which it will be sold to the ultimate consumer____ [Emphasis supplied]
(c) Machinery, apparatus, or equipment is considered to be directly used in production only when it is used to initiate, sustain or terminate the transformation of raw materials into finished products____ [Emphasis supplied]
Plaintiff contends that its photomask machinery meets the exemption requirements because, first, the photomask process is a manufacturing process which leads directly to the production of tangible personal property, i.e., photomasks. Accordingly, plaintiff maintains that it complied with the exemption provision even though its photomasks are not sold. Plaintiff’s argument is that the statutory exemption does not require that the end product of the manufacturing process be sold.
Second, and in the alternative, plaintiff contends that, even if the exemption provision is limited to machinery that is directly used in the production of tangible personal property “for sale,” its photomask machinery is exempt because it is involved in a process that is an indispensable first step toward the production of integrated circuits, which are sold by plaintiff.
A.

Must the final product be for sale?

As noted, plaintiff’s first argument is that there need not be a sale of the tangible personal property produced by the manufacturing process in order to meet the exemption requirements of § 8.13a. The Director observes that if plaintiff’s contention is a correct construction of § 8.13a., then plaintiff’s photomask machinery is, indeed, exempt. This is so, because as the Director appropriately concedes: (1) plaintiff’s photomask machinery is “machinery” within the purview of § 8.13a., (2) the production of photomasks does constitute a manufacturing *331 process, (3) plaintiffs photomask machines and equipment are directly and primarily used to produce photomasks, and (4) photomasks are tangible personal property.
The Director, however, maintains that plaintiffs construction of § 8.13a. is not correct. It is the Director’s position that there is an implicit requirement in § 8.13a. that the end product of the manufacturing process must be “for sale” to a consumer and not for use by the manufacturer for its own purposes. In support of this position the Director relies upon: (1) the scheme of the act itself, (2) his above-cited interpretive regulations, (3) the administrative practice of the Division of Taxation since, at least, September 1977, (4) a legislative history which, according to the Director, does not suggest that the Legislature intended the broad exemption claimed by plaintiff and (5) the 1988 final report of the State and Local Expenditure and Revenue Policy Commission (SLERP). For the reasons hereinafter expressed, I have concluded that the Director’s position on this point is correct.
In support of its position that the manufacturing process need only produce tangible personal property, but not necessarily “for sale,” plaintiff relies upon: (1) the legislative history of § 8.13a. as revealed in the 1972 report of the New Jersey Tax Policy Committee, (2) the language employed in § 8.13a., and (3) a decision of the Alabama Supreme Court in State v. Calumet, etc., 66 So.2d 726 (Ala.Sup.Ct.1953), construing an Alabama exemption provision.
Preliminarily, by way of background, it must be observed that the manufacturing exemption was included in the Sales and Use Tax Act when originally enacted by our Legislature in 1966. See L. 1966, c. 30, § 8(m)(1), effective April 29, 1966. That provision was amended shortly thereafter by L. 1966, c. 53, effective May 25, 1966, and the language of the amended provision is identical to the language employed in the current § 8.13a. manufacturing exemption. The manufacturing exemption, however, was repealed by the Legislature in 1970. See L. 1970, c. 7, effective March 1, 1970.
*332 In 1972, the New Jersey Tax Policy Committee issued a report in which it discussed the production machinery exemption and, based on economic considerations, recommended the restoration of the exemption. See Report of the New Jersey Tax Policy Committee (1972), Part V, “Non-property taxes in a fair and equitable tax system,” at 73. Plaintiff points out that the committee believed that a failure to restore the machinery exemption would “lead to dire consequences for the economic health of the State in terms of business and industrial location, retention of industry and expenditures on plant and equipment, all of which, in turn, suggest [a] discouraging implication for jobs, income and government revenue.” Ibid.
The Legislature did restore the production machinery exemption in 1977. See L. 1977, c. 18. Plaintiff argues that the policy objectives of encouraging industry to remain, or locate, in New Jersey as noted by the committee, requires the § 8.13a. exemption to “be construed to provide exemption for equipment which is used in an essential and substantial step of a unified manufacturing process.” The Director, in contrast, maintains that it cannot be concluded, from any legislative history, that the Legislature intended to liberally exempt all machinery used in manufacturing, and therefore, the usual principle of statutory construction that exemptions from taxation should be narrowly construed should prevail in this case.
I am in agreement with the Director’s conclusion, partly for reasons advanced by the Director, and partly based on other considerations relative to principles of statutory construction. To begin with, in making its legislative history argument, plaintiff fails to observe that the specific recommendation of the tax policy committee was to restore the exemption formerly afforded under § 8(m)(l). Ibid. What is significant is that the Director, in August 1969, had adopted regulations interpreting the production machinery exemption that was in existence as § 8(m)(l) at that time. See N.J.A.C. 18:24-25 (August 1969). These regulations were virtually identical to the regulations adopted by the Director after the machinery exemption provi *333 sion at § 8.13a. was reenacted by the Legislature in 1977. See and compare N.J.A.C. 18:24-4.2, -4.4 with N.J.A.C. 18:24-25 (August 1969).
Both sets of regulations interpret the machinery exemption as being applicable only when the finished product is tangible personal property “for sale” to the “ultimate consumer.”
As illustrated in N.J.A.C. 18:24-4.4(b), the concept of “production” is limited to those manufacturing operations which culminate in a product which “will be sold to the ultimate consumer.” Moreover, “machinery” as defined in N.J.A.C. 18:24-4.2 requires that the machine be used in “manufacturing tangible personal property for sale.” As the Director observes, these regulatory provisions demonstrate that the manufacturing exemption is limited to machinery that is used directly and primarily in the production of tangible personal property for sale.
The tax policy committee specifically recommended a restoration of the machinery exemption and that exemption provision had been interpreted by the Director through the regulations issued in August 1969. The committee had to have been acutely aware of the Director’s interpretive regulations at the time that it made its specific recommendation, yet, it did not suggest any changes in statutory language.
When the Legislature, in fact, reenacted the exemption provision it employed the identical language of the former exemption provision. Thus, it must be presumed that it agreed with, and adopted, the interpretation of that language by the very agency charged with its administration.[2] See Ford Motor Co. v. N.J. Dept, of Labor & Industry, 7 N.J.Super. 30, 38, 71 A.2d 727 (App.Div.1950) (“Where a statute has received a ... *334 practical interpretation, and the statute as interpreted is re-enacted, the practical interpretation is accorded greater weight than it ordinarily receives, and is regarded as presumptively the correct interpretation of the law.”); see also In re Estate of Gillmore, 101 N.J.Super. 77, 86, 243 A.2d 263 (App.Div.1968) (“Where the Legislature amends a statute after it has been administratively construed, leaving intact that language, it may be inferred that the administrative interpretation has its approval.”); 2A Sutherland, Statutory Construction (4 ed. 1984), § 49.09 at 400-401.
Subsequent to the reenactment of the production machinery exemption by the Legislature, the Director promulgated the current regulations interpreting the manufacturing exemption in § 8.13a. in September 1977. According to the testimony adduced at the trial, the Director's practical administrative construction of the manufacturing exemption has been in accord with his regulations to require “that in order to be deemed ‘directly used’ machinery must act upon the raw materials which become, through the manufacturing process, the finished product to be sold to the consumer.”
It is a well-settled principle that an administrative construction of a statute with which the Legislature has not interfered over an extended period of time is proof that the administrative interpretation conforms with legislative intent, and thus, is accorded great weight. Body-Rite Repair Co. v. Director, Div. of Taxation, 89 N.J. 540, 545-546, 446 A.2d 515 (1982).
Additionally, “the agency’s interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable.” Metromedia v. Director, Div. of Taxation, 97 N.J. 313, 326, 478 A.2d 742 (1984). Inasmuch as the Legislature presumptively adopted the Director’s interpretive gloss when it reenacted the machinery exemption, it cannot be concluded that the Director’s interpretation is plainly unreasonable.
The Director also points to the 1988 Final Report of the State and Local Expenditure and Revenue Policy Commission *335 (SLERP). In that report the commission recommended that the existing statutory language in § 8.13 be “clarified” by “expanding the exemption to include the sales of supplies” and “extending the exemption to machinery which is used to produce production equipment, parts or other features of the production machinery itself.” See Final Report, SLERP (1988), at 118.[3] The Director asserts that this recommendation recognizes the common understanding that the manufacturing exemption does not apply to machinery used to produce something other than a final product for sale.[4]
In response, plaintiff states that the commission used the word “clarify” to show that the recommendation was only to make clear that which already existed. I am not persuaded by plaintiff’s response. Although the commission used the word “clarify,” it did not seek to make clear that which already existed, but rather to make the exemption provision clear by specifically “extending” it to include “machinery which is used to produce production equipment.” The meaning of “clarify,” can be seen in the fact that the commission also suggested that the exemption be “expanded” to include “supplies,” an item that is clearly not exempt under the present exemption provision in § 8.13.
In light of the legislative history of the manufacturing exemption, the Director’s interpretive regulations, i.e., those that predated the reenacted exemption and those that followed, the Director’s longstanding practice with which the Legislature has *336 not interfered and the common understanding of the exemption provision,[5]1 find the Director’s construction manifestly reasonable, and accordingly, must prevail. See Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 327, 478 A. 2d 742. In order for the manufacturing exemption to apply, the tangible personal property being produced must be “for sale.”[6]
B.

Was plaintiffs photomask machinery used “directly” in the production of integrated circuits?

Plaintiff insists that even if there is an implicit requirement in § 8.13a., that the tangible personal property being produced in the manufacturing process be “for sale,” its photo-mask machinery still qualifies for exemption. The thrust of plaintiff’s alternative argument is that its photomask machinery determines the configuration of its integrated circuits, plaintiff’s ultimate product for sale, and thus, has a direct effect on the end product. Plaintiff maintains that the photo-mask machinery is “so essential and substantial a step in the manufacturing process [its machinery] must be considered to be used ‘directly’ in the production of the product for sale.”
In contrast, the Director, relying upon his regulations at N.J.A.C. 18:24-4.4(b), -4.4(c) and Atlantic City Elec. Co. v. Taxation Div. Director, 7 N.J.Tax 554 (Tax Ct.1985), maintains *337 that plaintiff’s photomask machinery is not “directly” used in the production of the integrated circuits which are sold by plaintiff to its customers.
N.J.A.C. 18:24-4.4(b), in pertinent part, provides:
Production is limited to those operations commencing with the introduction of raw materials into a systematic series of manufacturing ... operations, and ceases when the product is in the form in which it will be sold to the ultimate consumer____ [Emphasis supplied]
N.J.A.C. 18:24-4.4(c), in pertinent part, provides:
Machinery, apparatus, or equipment is considered to be directly used in production only when it is used to initiate, sustain or terminate the transformation of raw materials into finished products. In determining whether property consisting of machinery, apparatus or equipment is “directly” used, consideration must be given to the following factors:
1. The physical proximity of the property in question to the production process in which it is used;
2. The proximity of the time of use of the property in question to the time of use of other property used before and after it in the production process; and,
3. The active causal relationship between the use of the property in question and the production of a product. The fact that particular property may be considered essential to the conduct of manufacturing, processing, assembling or refining because its use is required either by law or practical necessity does not, of itself, mean that the property is used directly in manufacturing, processing, assembling or refining. [Emphasis supplied]
Plaintiff maintains that its photomask machinery meets the requirements of both regulatory provisions. First, it notes that the definition of “production” in N.J.A. C. 18:24-4.4(b) does not require that the raw materials introduced into the initial operation of a series of manufacturing operations be part of the final product. As such, when plaintiff commences its photomask operation with an unpatterned photoplate, it is introducing “raw materials into a systematic series of manufacturing ... operations” even though the photoplates do not become part of the finished product, i.e., the integrated circuits. This argument is not persuasive.
It is clear that when the regulation speaks of raw materials, the raw materials contemplated are those that are transformed by the manufacturing process into a different form and are included in the final product. This is evident from the use of the phrase “raw materials” in N.J.A.C. 18:24-4.4(c) in which *338 “machinery ... is considered to be directly used in production only when it is used to initiate, sustain or terminate the transformation of raw materials into finished products.” Since the photoplates used in the photomask operation are not “transformed" into finished products, they are not raw materials in the limiting definition of “production,” which begins with the introduction of raw materials.
This conclusion is of some significance when considered in conjunction with the opinions of the Tax Court in Atlantic City Elec. Co. v. Taxation Div. Director, supra, and Millington Quarry, Inc. v. Taxation Div. Director, 5 N.J.Tax 144 (Tax Ct.1983). In both cases, the court, in its consideration of manufacturing exemptions under § 8.13, began its analysis by focusing upon, and determining, when production commenced. See Atlantic City Elec. Co., supra, 7 N.J.Tax at 558; Millington Quarry, Inc., supra, 5 N.J.Tax at 149.
As a consequence, in Millington Quarry, Inc., Judge Hopkins concluded that a quarry refining operation commenced at the “rock face in the quarry,” and therefore, machinery such as power shovels, rock trucks, and loaders used to pickup, load, transport and then reduce stone into a useable size, were all exempt from tax pursuant to the manufacturing exemption at § 8.13a. This was based on the Director’s regulation that machinery used “to initiate, sustain or terminate the transformation of raw materials into finished products” is considered directly used in production. 5 N.J.Tax at 149, 151-154; N.J. A.C. 18:24-4.4(c).
Once having decided the point at which production commenced or was initiated, the court simply concluded that any machinery used in the process whether to initiate, sustain or terminate the transformation process, regardless of whether it involved one or more processing steps, was statutorily exempt. Ibid.
So too was the conclusion in Atlantic City Elec. Co. v. *339 Taxation Div. Director, supra[7] in which the court held that the rentals of railroad tank cars used to deliver fuel oil to the taxpayer’s electrical generating station were subject to sales tax. 7 N.J.Tax at 563. In that case, which involved the production and generation of electricity, Judge Lasser broached his analysis with the question, “when does production or generation begin?” Id. at 558. The court determined that production commenced at the generating station, and therefore, machinery and equipment, involved in activities that occurred off-site prior to the beginning of the production process, were not “directly used” in the production of electricity. Although the court spoke of on-site versus off-site machinery or equipment, the standard employed by the court was the Director’s regulation, i.e., whether the machinery or equipment “initiated,” “sustained” or “terminated” the production process. Id. at 561.
In this case, as the Director contends, the production process for the integrated circuits commenced with “the introduction of the raw materials,” i.e., silicon wafers, and “cease[dj when the product [was] in the form in which it [was] sold to the ultimate consumer.” N.J.A.C. 18:24-4.4(b). That which took place prior to the beginning of the production process was not “directly” involved in the manufacture of integrated circuits under the Director’s regulations, even though the photomask operation and the photomasks may have been essential to the ultimate production of integrated circuits. As Judge Lasser appropriately observed in Atlantic City Elec. Co., essentiality is not the criterion. 7 N.J.Tax at 559-560. Rather, as the Director’s regulation reveals, the test is when does the actual manufacturing activity begin and end and is the machinery used during that manufacturing period.
*340 Additionally, the Director argues that plaintiff's photo-mask machinery does not meet the requirement of “direct use” set forth in N.J.A. C. 18:24-4.4(d) because the machinery is not physically proximate to the wafer fabrication process nor does use of the photomask machinery have proximity in time with the production of integrated circuits. While plaintiff concedes that there is a distance of time and space[8] between the use of the photomask machinery and the wafer fabrication machinery and equipment, it maintains that the most important factor in the Director’s regulation at N.J.A.C. 18:24-4.4(c)3 is the “active causal relationship between the use of the property in question and the production of a product.”
The Director, not disputing a causal relationship, maintains that an active causal relationship is only one factor to which the Director must give consideration and that he need not give controlling weight to that factor alone. Additionally, the Director asserts that while “causal relationship” is a factor for consideration, the regulation clearly specifies that “[t]he fact that particular property may be considered essential to the conduct of manufacturing ... because its use is required by ... practical necessity does not, of itself, mean that the property is used directly in manufacturing.” N.J.A.C. 18:24-4.4(c)3; emphasis supplied.
Given the fact that the Director’s regulation at N.J.A.C. 18:24-4.4(c) does accord an ordinary, although somewhat narrow, interpretation of the phrase “directly used,” and the court cannot conclude that the interpretation is, for some observable reason, unreasonable or arbitrary, this court cannot substitute its judgment for that of the Director. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563, 384 *341 A.2d 795 (1978). In light of the fact that essentiality is not the statutory criterion for the manufacturing exemption, see Atlantic City Elec. Co., supra, 7 N.J.Tax at 559-560, and the language of the regulation itself, which does not equate the word “essential” with the word “directly,” I cannot conclude that the Director’s failure to given controlling weight to the factor of “active causal relationship” in his determination was either unreasonable or arbitrary.
Therefore, I conclude that plaintiff’s photomask machinery was not used “directly” in the production of tangible personal property for sale, and accordingly, is not exempt from sales or use tax pursuant to § 8.13a.
Relative to the issue of whether plaintiff’s photomask machinery was used “directly” in the production of its integrated circuits, one additional point requires brief mention. Plaintiff has gone to great lengths to demonstrate that the majority rule in this country is that manufacturing equipment which produces an item that, in turn, is used to produce property for sale is considered to be used directly in manufacturing. Plaintiff has analyzed and offered to this court, cases from Iowa, New York, Massachusetts, Missouri, Arkansas, Idaho, Indiana, Kentucky, Maine and Wisconsin to support its position, while noting that, perhaps, the courts in Georgia and Tennessee would probably find plaintiff’s photomask machinery to be taxable. See Annotation, “What constitutes direct use within meaning of statute exempting from sales and use taxes equipment directly used in production of tangible personal property,” 3 A.L.R.4th 1129 (1981) which catalogs cases that hold on both sides of the question presented in this case.
I find that, in this case, I am in agreement with a conclusion reached by the Appellate Division in Autotote Ltd. v. New Jersey Sports, etc., Auth., 171 N.J.Super. 480, 410 A.2d 52 (App.Div.1979), rev’d on other grounds, 85 N.J. 363, 427 A.2d 55 in which the court remarked: *342 Any analysis of out-of-state cases would be largely irrelevant in this case, because, in the end, the Director’s regulation would be the controlling authority. Absent the invalidity of the regulation, not much is gained by a thorough review of out-of-state court opinions.[9]
*341 The interpretation of out-of-state statutes by the courts of the jurisdictions are rarely helpful in providing an appropriate key to the interpretation of a New Jersey statute because of differing public policy concepts and objectives, [at 489]
*342 Since I have concluded that plaintiff’s photomask machinery was not used “directly” in the production of plaintiff’s integrated circuits, it is unnecessary to consider whether the machinery was used “primarily” in .that production process because the two requisites of the .exemption statute are recited conjunctively. Production machinery, to be eligible for exemption, must be used both “directly” and “primarily” in the production of tangible personal property for sale. N.J.S.A. 54:32B-8.13a.
II.

Are the photoplates purchased by plaintiff and used as reticles and printmasters exempt from sales or use tax pursuant to the manufacturing exemption of N.J.S.A. 54.32B-8.13a. ?

Plaintiff contends that the photoplates it purchases to make reticles and print masters, which remain in its photomask operation and are not sent to its wafer fabrication operations, are within the manufacturing exemption at § 8.13a. According to plaintiff, this is because the photoplates constitute either machinery, apparatus or equipment used directly and primarily in the production of tangible personal property or parts, having *343 a useful life of more than one year, of qualified machinery, apparatus or equipment.
As the Director appropriately observes, the photoplates, even if considered machinery, apparatus or equipment or parts of such qualified equipment, must be used “directly” in the production of plaintiff’s final product for sale, i.e., integrated circuits. Since it has been determined that plaintiff’s photo-mask machinery does not meet the statutory requisite of direct use in production, then those photoplates or photomasks that are used solely with photomask machinery to produce other photomasks cannot qualify for exemption. Thus, it becomes unnecessary to address a number of issues raised by the briefs of the parties, including, but not limited to, the questions of: (1) whether plaintiff’s reticles or print masters are machinery, apparatus or equipment, (2) whether plaintiff’s reticles or print masters, if not machinery, apparatus or equipment, are parts of such exempt equipment having a useful life of more than one year, (3) whether plaintiff’s reticles and print masters are used “primarily” in the production of tangible personal property for sale and (4) whether the Director can adopt a position that is inconsistent with a position taken during his audit of plaintiff’s operations, and apparently inconsistent with the issues framed in the pretrial order.
III.

Conclusion.

I conclude that the receipts from the purchases by plaintiff’s predecessor of photomask machinery and photoplates used as reticles and print masters in plaintiff’s photomask operation, do not qualify for exemption from sales or use tax under § 8.13a. of the Sales and Use Tax Act.
The Clerk of the Tax Court is directed to enter judgment affirming the determination of the Director of the Division of Taxation.

 During the audit conducted by the Division of Taxation the division conceded that the manufacturing exemption did apply to the purchase of photoplates that were made into photomasks which were then employed in plaintiffs wafer fabrication operations. Accordingly, photoplates that became projection masters and contact prints used in wafer fabrication were not subjects of the deficiency assessment.

 Indeed, as the Director points out, if the Legislature wished to enact a broad or liberal machinery exemption provision it could have adopted the language of the Pennsylvania statute which includes within its manufacturing exemption the production of tangible personal property "whether for sale or use by the manufacturer.” See Commonwealth v. Olan Mills, Inc., 456 Pa. 78, 317 A.2d 592, 594-595 (1974).

 Although the commission report does not constitute legislative history inasmuch as it comes after the legislation at issue, the report, nevertheless, is significant in its reflection of the common understanding of the machinery exemption in § 8.13a.

 This common understanding is also reflected in Phelps Dodge Indus, v. Taxation Div. Director, 8 N.J.Tax 354, (Tax Ct.1986) in which Judge Lasser of this court remarked:
It is the general scheme of the Sales and Use Tax Act with regard to manufacturing that the end product, if it is tangible personal property, is subject to sales and use tax, as are manufacturing supplies, tools and parts with a useful life of one year or less, [at 363; footnotes omitted]

 Plaintiff argues that the express use of the words "for sale" in subpart b. of the exemption provision at § 8.13 demonstrates that the Legislature intentionally omitted the words "for sale” in subpart a. of § 8.13. The argument is not convincing. In § 8.13b. the Legislature expressed a desire to exempt machinery used in the production of electricity, etc., "for sale" or in the operation of sewerage systems. The use of the words "for sale" was required to permit an expansion of the machinery exemption to the production of electricity, etc. other than "for sale.” In § 8.13a. the expression, "for sale," was unnecessary.

 The case of State v. Calumet, etc., supra, cited by plaintiff, has no persuasive value in this case because there were no interpretive regulations which the Alabama Legislature presumptively adopted in its enactment of its manufacturing exemption, nor were there any longstanding administrative regulations interpreting the manufacturing provisions.

 Atlantic City Elec. Co. involved a claim of exemption pursuant to N.J.S.A. 54:32B-8.13b. for receipts from the sales of machinery directly and primarily used in the production of gas or electricity, etc. The analysis, however, relied upon the same regulations of the Director implicated in this proceeding.

 As the Director has pointed out to the court, although certain of plaintiffs wafer fabrication operations occurred at its Somerville location, the same location of plaintiffs photomask operation, the majority of plaintiffs wafer manufacturing operations took place in Ohio, Pennsylvania and Florida. Additionally, there was no evidence indicating a temporal proximity between the photomask operation and plaintiffs wafer fabrication operations.

 Although plaintiff does not agree with the Director's interpretation of his own regulations, characterized as strained and unrealistic by plaintiff, and has challenged their validity if they are construed narrowly as the Director has done, plaintiff offers no authority to support its claim that the Director’s interpretation is much too narrow and restricted.
The Director’s interpretation, while narrow, is not unreasonable, and therefore, should prevail. Additionally, the regulations and the Director’s restrictive interpretation are of longstanding. The Legislature has not sought to either override the Director’s regulations or his practice. Absent persuasive evidence that the Director's interpretation is not only a minority view but an unreasonable one, this court should defer to the agency’s expertise.