NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2201-20
                           A-2202-20

DOBCO, INC.,

      Plaintiff-Appellant,

v.

BERGEN COUNTY
IMPROVEMENT AUTHORITY
and COUNTY OF BERGEN,

      Defendants-Respondents.

_____

HOSSAM IBRAHIM,

      Plaintiff-Appellant,

v.

BERGEN COUNTY
IMPROVEMENT AUTHORITY
and COUNTY OF BERGEN,

      Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

July 8, 2021

APPELLATE DIVISION

Argued June 1, 2021 – Decided July 8, 2021

Before Judges Messano, Hoffman and Smith.

On appeal from the Superior Court of New Jersey, Civil Part, Passaic County, Docket Nos. L-0486-21 and L-0508-21.

Greg Trif argued the cause for appellants Dobco, Inc. and Hossam Ibrahim (Trif & Modugno, LLC, attorneys; Greg Trif and Kyle H. Cassidy, of counsel and on the brief).

Mary Anne Groh argued the cause for respondent Bergen County Improvement Authority (Cleary Giacobbe Alfieri Jacobs, LLC, attorneys; Mary Anne Groh, of counsel and on the brief).

Leslie G. London argued the cause for respondent County of Bergen (McManimon, Scotland & Baumann, LLC, attorneys; Leslie G. London, of counsel and on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -89 (the LRHL), a municipality may implement a redevelopment project directly, or it may authorize another public body to act as the "redevelopment entity." N.J.S.A. 40A:12A-4(c); see also N.J.S.A. 40A:12A-3 (defining "[r]edevelopment entity" as "an entity authorized by the governing body of a municipality pursuant to [N.J.S.A. 40A:12A-4] to implement redevelopment plans and carry out redevelopment projects"). A county improvement authority organized pursuant to the County Improvement Authorities Law, N.J.S.A. 40:37A-44 to -135 (the CIAL), may serve as a

designated redevelopment entity pursuant to the LRHL. N.J.S.A. 40A:12A-4(c). When the LRHL was enacted in 1992, only three types of public entities, other than municipalities, were authorized to act as redevelopment entities: municipal redevelopment agencies, municipal housing authorities, or county improvement authorities. L. 1992, c. 79, § 4; N.J.S.A. 40A:12A-4(c).[1] In 2017, the Legislature authorized municipal parking authorities to serve as designated redevelopment entities. L. 2017, c. 253; 40A:12A-4(c); see also N.J.S.A. 40:11A-4.1 (a section of the "Parking Authority Law," N.J.S.A. 40:11A-1 to -26 (the PAL), which permits a municipality to, by ordinance, "authorize its parking authority to serve as a redevelopment entity").

The Legislature granted redevelopment entities broad powers to effectuate a redevelopment plan, permitting the entity to

> contract with . . . redevelopers for the planning, replanning, construction, or undertaking of any project or redevelopment work, or any part thereof; negotiate and collect revenue from a redeveloper to defray the costs of the redevelopment entity, including where applicable the costs incurred in conjunction with bonds, notes or other obligations issued by the redevelopment entity, and to secure payment of such revenue; . . . provide for extension of credit, or making of loans, to redevelopers to finance any project or redevelopment work, or upon a finding that

---

[1] The LRHL defined "[h]ousing authority" and "[r]edevelopment agency" to include newly created entities as well as those in existence at the time of the statute's enactment. N.J.S.A. 40A:12A-3.

A-2201-20

the project or redevelopment work would not be undertaken but for the provision of financial assistance . . . provide as part of a[] . . . contract for capital grants to redevelopers; and . . . contract with . . . redevelopers for the opening, grading or closing of streets, roads, roadways, alleys, or other places or for the furnishing of facilities or for the acquisition by such agency of property options or property rights or for the furnishing of property or services in connection with a redevelopment area.

[N.J.S.A. 40A:12A-8(f).]

With limitation irrelevant to these appeals, a redevelopment entity may "lease or convey property or improvements to any other party . . . without public bidding and at such prices and upon such terms as it deems reasonable . . . notwithstanding the provisions of any law, rule or regulation to the contrary." N.J.S.A. 40A:12A-8(g) (emphasis added). The designated redevelopment entity may "[d]o all things necessary or convenient to carry out its powers." N.J.S.A. 40A:12A-8(n).

However, the LRHL also provides that "[e]ach redevelopment agency and housing authority shall be subject to the provisions . . . of the 'Local Public Contracts Law'" (the LPCL).[2] N.J.S.A. 40A:12A-23. (emphasis added). Municipal parking authorities authorized to act as redevelopment entities may "enter into . . . any and all contracts . . . necessary or useful . . . to carry[ing]

---

[2] The LPCL is codified at N.J.S.A. 40A:11-1 to -60.

out any of the powers expressly granted to it by [the PAL] <u>or any other acts subject to . . . [the] 'Local Public Contracts Law</u>.'" N.J.S.A. 40:11A-6(4)(l).

In 1979, the Legislature made sweeping changes to the CIAL which permitted county improvement authorities to serve as redevelopment entities for the first time. <u>L.</u> 1979, <u>c.</u> 275 §§ 31-34. Those amendments included: 1) the adoption of definitions relating to redevelopment projects identical to those in the subsequently enacted LRHL, N.J.S.A. 40:37A-45; and, 2) providing county improvement authorities with additional powers that allowed them to "plan[], initiat[e] and carry[] out redevelopment projects . . . and . . . dispos[e] . . . of any property . . . acquired in the area of such project," N.J.S.A. 40:37A-54(a) and (j), and "[t]o extend credit or make loans to redevelopers." N.J.S.A. 40:37A-55(q).

The Legislature also enacted a new section to the CIAL in 1979, N.J.S.A. 40:37A-55.1, which granted county improvement authorities broad powers "[f]or purposes of the redevelopment of blighted . . . areas." However, those redevelopment powers were "subject to the provisions of this act." <u>Ibid.</u> Moreover, the Legislature did not amend N.J.S.A. 40:37A-55(t), which permits a county improvement authority "[t]o enter into any and all agreements or contracts . . . and perform any and all acts or things necessary, convenient or desirable for the purposes of the authority or to carry out any power expressly

5

given in this act subject to the 'Local Public Contracts Law.'"   (emphasis added).

In these consolidated appeals, the three statutory schemes — the LRHL, the CIAL, and the LPCL — converge, requiring us to decide whether under the particular facts presented the Bergen County Improvement Authority (BCIA), designated by the City of Hackensack as the "redevelopment entity" for a portion of a duly designated redevelopment area — the historic Bergen County Courthouse (the Courthouse) — may select a "redeveloper" without regard to the LPCL.  The BCIA and the County of Bergen (the County) contend that a redevelopment entity may choose a redeveloper without public bidding.  See Vineland Constr. Co., v. Twp. of Pennsauken, 395 N.J. Super. 230, 255 (App. Div. 2007) (holding "the LRHL does not set forth any criteria governing the selection of a private redeveloper." (citing Bryant v. City of Atl. City, 309 N.J. Super. 596, 624 (App. Div. 1998)).  Therefore, the BCIA and the County argue the BCIA may choose a "redeveloper" through a process that does not require public bidding, by first soliciting responses to requests for qualifications (RFQs), winnowing those responses, and then soliciting responses to requests for proposals (RFPs) from those on the shorter list.

In this case, the BCIA issued an RFQ which designated the general contractor for the project as the "redeveloper," and said the BCIA would

contract with the general contractor to provide goods and services for the rehabilitation of the Courthouse. The redeveloper would be paid with public funds the BCIA obtained through the issuance and sale of bonds guaranteed by the County. In other words, unlike most redevelopment agreements, here, the "redeveloper" would be paid with public funds to provide goods and services to the BCIA that are typically subject to public bidding, but with no public bidding.

The trial court dismissed complaints brought by plaintiffs, Dobco, Inc. (Dobco), and one of its principals, Hossam Ibrahim, challenging the RFQ selection process. The court accepted the BCIA's and the County's arguments that because the BCIA was acting as a redevelopment entity pursuant to the LRHL, it need not comply with the LPCL. We disagree and reverse in A-2202-20. For other reasons, we affirm in A-2201-20.

I.

In 2011, Hackensack designated its downtown as an area in need of rehabilitation pursuant to the LRHL and adopted a redevelopment plan for the designated area. The redevelopment area included certain properties owned by the County, including the Courthouse (Project Site). In 2019, the BCIA adopted a resolution authorizing the issuance of up to $60 million in "County Guaranteed Governmental Lease Revenue Bonds" for the purpose of financing

7

A-2201-20

the "reconstruct[ion], rehabilitat[ion] and improve[ment] [of] certain County buildings," including the Courthouse. A resolution approved in September 2019 stated that the BCIA would use the proceeds from the bonds to finance the project and would "simultaneously . . . enter into a lease purchase agreement with the County . . . pursuant to which the [BCIA would] lease the Project to the County for its use and ultimately convey the Project to the County."[3] The resolution also stated that the County agreed to guarantee the bonds "in order to assist the [BCIA] with the Project," and the Local Finance Board had approved the issuance of the bonds and the County's guarantee.

In October 2019, the County and the BCIA entered into an "Improvement Lease and Agreement," whereby the County agreed to lease certain buildings it owned to the BCIA for nominal rent in contemplation of the BCIA's completion of the "Improvement Project." The BCIA would then lease the improved real estate back to the County and ultimately convey the properties to the County at the end of the lease term.

On August 18, 2020, Hackensack adopted a resolution designating the BCIA as the "redevelopment entity" for the "Project Site." The resolution cited the BCIA's collaboration with the County "to facilitate the substantive

___

[3] The "Project" as defined in the resolution included several other county buildings and facilities in addition to the Courthouse.

rehabilitation and redevelopment of the County Courthouse," and it "empowered" the BCIA "to perform all actions necessary, proper and authorized under the [LRHL] in furtherance of the Redevelopment Plan with respect to the Project Site."

On November 6, 2020, the BCIA issued a "Request for Qualifications for Redevelopment/Rehabilitation Services for the Substan[t]ial Rehabilitation of the Bergen County Justice Complex." The RFQ stated that the BCIA, acting as the redevelopment entity, was "seeking to engage the services of a Build Team to provide general contracting for the [r]ehabilitation of the Justice Center." The RFQ specified that the County had already engaged a company to serve as "Construction Manager and owner[']s representative for the Project[,]" and "ha[d] developed substantial plans . . . that will be used to direct the contractor." Additionally, the RFQ provided that "[t]he Redevelopment Team shall consist of a General Contractor and a Value Engineering Consultant," and "will provide value engineering, construction administration and general contracting services (for all trades), including securing all required permits and approvals, for the Project." According to the RFQ, "[t]he General Contractor will hold the Redevelopment Contract with the BCIA and in that capacity will . . . be called the Redeveloper."

9

The RFQ explained that a selection committee would review and evaluate the proposals submitted and recommend a "short list" of no more than four Redevelopment Teams "to compete for a [r]edevelopment contract for the Project." The short list of respondents would then be invited to respond to an RFP in the second phase of the selection process.

Nine companies, including Dobco, submitted proposals in response to the RFQ. Ibrahim is the vice-president and a shareholder of Dobco, and a resident and taxpayer of Bergen County. On December 21, 2020, the BCIA notified four firms selected to proceed to the next phase of the procurement process, and it notified Dobco and the other firms not selected for the short list.

Plaintiffs immediately filed separate, but essentially identical, verified complaints alleging that defendants' actions violated the LPCL and were arbitrary and capricious.[4] Plaintiffs sought temporary and permanent restraints enjoining defendants from continuing with, or entering into any agreement pursuant to, the solicitation, recission of any contract or resolution authorizing

---

[4] Dobco's complaint contains three paragraphs not included in Ibrahim's complaint. Those paragraphs claimed that Dobco sought information from the BCIA, questioned its ability to proceed without following the LPCL, and was told that the County was "intentionally avoiding the LPCL" so the contract would not be awarded to Dobco. There is nothing in the complaint or the appellate record that supports these assertions.

defendants to enter into a contract pursuant to the solicitation, and judgment declaring that defendants' actions violated the LPCL.

The trial court entered orders to show cause with temporary restraints, and, prior to filing answers, defendants moved to dismiss the complaints.[5] The court heard oral argument, and on April 1, the judge entered orders denying plaintiffs' requested relief and dismissing plaintiffs' complaints with prejudice for failure to state a claim pursuant to Rule 4:6-2(e).

In a written decision accompanying the orders, the judge concluded that the project was "not subject to the LPCL because it has been designated a

---

[5] The trial court did not require the mandatory joinder of the four firms selected to proceed in the process as indispensable parties. See R. 4:28-1(a). Nor did any of the firms apparently seek to intervene in the trial court action, and they have not done so before us. See R. 4:33-1 and -2 (governing mandatory and discretionary intervention). Arguably, those firms have "an interest in the subject of the action and [are] so situated that the disposition of the action in [their] absence may . . . impair or impede [their] ability to protect that interest." R. 4:28-1(a)(2)(i). We have recognized, for example, the indispensable nature of the second lowest bidder's presence in a challenge brought by the lowest bidder which was subsequently disqualified. Schlumberger Indus., Inc. v. Borough of Avalon, 252 N.J. Super. 202, 204, 213 (App. Div. 1991).

However, in this case, the RFQ was only the first step in a process wherein none of the four firms selected for the next round possessed an interest different from or more important than the interests of the BCIA and the County in seeing the process continue. Moreover, regardless of our resolution of this appeal, the four firms will undoubtedly be able to participate in whatever the procurement process may be going forward.

11

redevelopment project procured by the [LRHL]." He noted there was "no provision in the [LRHL] stipulating that the powers of a redevelopment entity are subject to the LPCL, or that the power to contract with a redeveloper at its discretion for the solicitation of 'bids' falls under the LPCL." The court found that the BCIA properly "exercised its broad discretion in establishing criteria for the selection of a redeveloper pursuant to the [LRHL]."

The judge further determined that plaintiffs were barred from seeking equitable relief because Dobco responded to the RFQ, and Ibrahim had not challenged the procurement process or the RFQ prior to filing his complaint. In addition, the judge determined that plaintiffs acted with unclean hands because their complaints did not mention Dobco's participation in the RFQ process. The court held plaintiffs "failed to establish a valid cause of action." The judge did not address plaintiffs' arguments, raised at oral argument but not pleaded in their complaints, that under the LRHL, the BCIA could not pay a redeveloper to construct the project and the County could not pledge taxpayer funds to secure the BCIA bonds. The judge subsequently denied plaintiffs' request for a stay pending appeal.

Plaintiffs sought leave before us to move for a stay pending appeal on an emergent basis, which we granted. On April 20, 2021, we granted plaintiffs' motions for a stay and consolidated and accelerated the appeals.

12

## II.

"We review a dismissal for failure to state a claim pursuant to Rule 4:6-2(e) de novo, following the same standard as the trial court." MasTec Renewables Constr. Co. v. SunLight Gen. Mercer Solar, LLC, 462 N.J. Super. 297, 309 (App. Div. 2020) (citing Castello v. Wohler, 446 N.J. Super. 1, 14 (App. Div. 2016)). "We . . . treat the [plaintiff's] version of the facts as uncontradicted and accord it all legitimate inferences. We pass no judgment on the truth of the facts alleged; we accept them as fact only for the purpose of reviewing the motion to dismiss." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 166 (2005) (citing R. 4:6-2(e)).

The critical concern is whether, upon review of the complaint, exhibits attached thereto and matters of public record, there exists "the fundament of a cause of action . . . ; the ability of the plaintiff to prove its allegations is not at issue." Id. at 183 (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). We only consider "whether a cause of action is 'suggested' by the facts." Teamsters Local 97 v. State, 434 N.J. Super. 393, 412 (App. Div. 2014) (quoting Printing Mart, 116 N.J. at 746).

Before turning to plaintiffs' arguments on the merits, we consider defendants' contentions, accepted by the Law Division judge, that plaintiffs are barred from challenging the RFQ process on procedural and equitable grounds.

13

Defendants claim the complaints were properly dismissed because plaintiffs never challenged the RFQ process until after Dobco submitted a proposal and was eliminated moving forward.

Certainly, the LPCL provides that a "prospective bidder who wishes to challenge a bid specification" must do so at less three days prior to the bid, otherwise the challenge "shall be considered void and having no impact on the contracting unit or the award of a contract." N.J.S.A. 40A:11-13; see also Jen Elec., Inc. v. Cnty. of Essex, 197 N.J. 627, 631 (2009) (construing N.J.S.A. 40A:11-13 to be "a statute of limitations" but otherwise not "restrict[ing] or otherwise substitut[ing] for traditional notions of standing"). Plaintiffs rightly note, however, that defendants asserted in the Law Division and continue to assert before us that the LPCL simply does not apply to these facts; defendants, therefore, cannot rely on a limitations period specific to the LPCL as barring the complaints.

However, plaintiffs ignore other precedent that does not rely on the statute of limitations contained in N.J.S.A. 40A:11-13. The decision in Autotote, Ltd. v. New Jersey Sports & Exposition Authority, 85 N.J. 363 (1981), provides facts most similar to this case. In Autotote, the Court considered whether the plaintiff-vendor, which had supplied services to the defendant authority via a negotiated contract, could now challenge the award

of a negotiated contract to a different vendor by asserting the contract needed to be publicly bid. Id. at 368–69. Noting that the plaintiff "was prepared to negotiate a new contract without public bidding[,]" the Court considered whether "[t]he abrupt 'about-face' in [the plaintiff's] attitude toward public bidding after [the competitor] was awarded the contract . . . raises the question whether [the plaintiff's] past conduct estops it from challenging the award." Id. at 369.

Citing its much earlier decision in Waszen v. City of Atlantic City, 1 N.J. 272 (1949), the Court noted "[t]he rationale of th[at] holding was that 'one cannot endeavor to take advantage of a contract to be awarded under illegal specifications and then, when unsuccessful, seek to have the contract set aside.'" Autotote, 85 N.J. at 369 (quoting Waszen, 1 N.J. at 276); see also Camden Plaza Parking, Inc. v. City of Camden, 16 N.J. 150, 158 (1954) (where, citing Waszen, the Court held an unsuccessful bidder lacked standing to challenge specifications allegedly "not sufficiently precise and definite" to promote "a common standard of competition").[6]

---

[6] In Autotote, finding "a paucity of judicial attention" to the "statutory provision" at issue, N.J.S.A. 5:10-21, and the "substantial public importance and large sums of public monies . . . at stake," the Court nevertheless proceeded to the merits of the case. 85 N.J. at 369. The Court held that the "degree of technical knowledge and professional skill" required from the vendor brought the contract within a statutory exception and could be awarded

Under the facts presented, we agree with defendants that Dobco is estopped from now complaining that a process in which it willingly participated violated the law. We see no principled reason that supports a different result in this case from those we have cited. We therefore affirm the dismissal of Dobco's complaint.

However, it is well-settled that "taxpayers . . . have the right to challenge whether public bidding is required in a particular instance." Yacenda Food Mgmt. Corp. v. N.J. Highway Auth., 203 N.J. Super. 264, 271 (App. Div. 1985); accord Camden Parking Plaza, 16 N.J. at 158–59 (noting the individual plaintiffs, "as citizens and taxpayers," may challenge the specifications and award despite unsuccessful bidder's lack of standing to do so). Ibrahim's additional personal stake in the litigation as a principal of Dobco "does not diminish his standing as a taxpayer." Yacenda, 203 N.J. Super. at 271 (citations omitted); see also Commc'ns Workers of Am., AFL-CIO v. Clymer, 292 N.J. Super. 138, 145–46 (Law Div. 1996) (acknowledging the plaintiffs' standing as "taxpayers and persons directly affected by the bidding process[,]" notwithstanding their union's status as unsuccessful bidder, and also rejecting

---

without public bidding. Id. at 373. Although the LPCL contains a similar exception for "professional services," see N.J.S.A. 40A:11-5(1)(a)(i), defendants have never claimed that the redeveloper services procured through the RFQ process in this case fall within this or any other exception to the LPCL.

A-2201-20

claim that the plaintiffs were "strawm[e]n" for the union (citing Yacenda, 203 N.J. Super. at 270–71)).

We reject BCIA's claim that the trial judge properly dismissed both complaints based on the doctrine of "unclean hands." See Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 158 (2001) ("The essence of [the unclean hands] doctrine . . . is that '[a] suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings.'" (second alteration in original) (quoting A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949))). The judge reasoned that despite having participated in the RFQ process, Dobco never disclosed that fact in its verified complaint.

While undoubtedly both defendants were aware Dobco submitted a proposal in response to the RFQ, the unclean hands doctrine has no application to Ibrahim's complaint. He was under no obligation to disclose Dobco's response to the RFQ in his taxpayer complaint, and, we reject any implicit contention that Ibrahim is simply a "strawman" for the company, thereby justifying dismissal of his complaint.

The BCIA argues that to the extent plaintiffs' complaints challenged its designation as the redevelopment entity for the Courthouse, its issuance of bonds, or the Local Finance Board's approval of the County's guarantee, they

17

were untimely pursuant to <u>Rule</u> 4:69-6.  That <u>Rule</u> requires an action in lieu of prerogative writs challenging government action to be commenced within forty-five days.  <u>Ibid</u>.  However, Ibrahim challenges none of those actions. Rather, he filed a challenge to the first step in the RFQ process, asserting the process required compliance with the LPCL.[7]

We are fully aware of the detriment caused to the public interest in this matter by further delay.  The County presents this as support for affirming the orders under review.  However, the RFQ solicitation was only the first step in a process that anticipated further evaluation of additional responses to the RFP submitted by those on the short list; the entire process to choose a "redeveloper" has no specific end date.

More importantly, it is axiomatic that if adherence to the LPCL were required, consideration of the merits of Ibrahim's complaint serves the greater public interest.  <u>See</u> <u>Meadowbrook Carting Co. v. Borough of Island Heights</u>, 138 N.J. 307, 313 (1994) ("[S]tatutes authorizing competitive bidding . . . promot[e] competition on an equal footing and guard[] against 'favoritism,

---

[7] In a separate point heading in their joint brief, plaintiffs argued the project's "contorted funding scheme offends the intent and spirit of the [LRHL], LPCL and CIAL."  As noted, the argument was not pled in plaintiffs' complaints although counsel raised it during oral argument before the Law Division judge. However, during oral argument before us, plaintiffs conceded that their challenge was limited to the expenditure of public funds as contemplated by the RFQ without compliance with the LPCL.

improvidence, extravagance and corruption.'" (quoting Twp. of Hillside v. Sternin, 25 N.J. 317, 322 (1957)).  We accelerated these appeals, issued an expedited briefing schedule, and calendared argument only two months after the judge entered the orders we review.

In short, for the reasons stated, we affirm the order dismissing Dobco's complaint in A-2201-20.  We reject the procedural and equitable arguments raised by defendants as to Ibrahim's complaint, the subject of the order under review in A-2202-21, and we proceed to consider the merits of plaintiff's arguments.

III.

The parties concede that the issue may be simply framed:  must the BCIA, acting as a "redevelopment entity" pursuant to the LRHL, comply with the bidding requirements of the LPCL when selecting and contracting a "redeveloper" to serve as general contractor for the rehabilitation of the Courthouse?  Although simply framed, resolution of the question involves interpretation of three complex statutory schemes.

"We review matters of statutory interpretation de novo."  MasTec Renewables, 462 N.J. Super. at 318 (citing Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017)).  "The objective of all statutory interpretation is to discern and effectuate the intent of the Legislature[,]" Murray v. Plainfield

Rescue Squad, 210 N.J. 581, 592 (2012), and "the best indicator of that intent is the statutory language" which should be given its "ordinary meaning and significance." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "We construe the words of a statute 'in context with related provisions so as to give sense to the legislation as a whole.'" Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018) (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017)).

"If the plain language leads to a clear and unambiguous result, then our interpretative process is over." Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007)). However, "[w]hen the statutory language is ambiguous and 'leads to more than one plausible interpretation,' courts may resort to extrinsic sources, like legislative history and committee reports." MasTec Renewables, 462 N.J. Super. at 320 (quoting State v. Twiggs, 233 N.J. 513, 533 (2018)).

Although courts may not "rewrite a plainly written statute or . . . presume that the Legislature meant something other than what it conveyed in its clearly expressed language[,]" Murray, 210 N.J. at 592, a court may "draw inferences based on the statute's overall structure and composition and may consider the entire legislative scheme of which [the statute] is a part." MasTec

20

Renewables, 462 N.J. Super. at 318 (alteration in original) (quoting Twiggs, 233 N.J. at 532). In addition, "[s]tatutes that deal with the same matter or subject should be read in pari materia and construed together as a unitary and harmonious whole." Ibid. (quoting Nw. Bergen Cnty. Utils. Auth. v. Donovan, 226 N.J. 432, 444 (2016)). Thus, "[w]hen interpreting multiple statutes touching upon the same subject . . . [courts] must attempt to harmonize the provisions of all statutes that the Legislature has enacted affecting the subjects involved." Nw. Bergen Cnty. Utils. Auth., 226 N.J. at 444 (citing Town of Kearny v. Brandt, 214 N.J. 76, 98 (2013)). "[U]nless there are other clues, a court must 'presume that the Legislature intended for its two statutory schemes . . . to generally work harmoniously, not in conflict with one another.'" MasTec Renewables, 462 N.J. Super. at 319 (quoting Nw. Bergen Cnty. Utils. Auth., 226 N.J. at 444). "A court must make every effort to avoid rendering any part of a statute inoperative, superfluous or meaningless." Id. at 318.

With these guideposts informing our review, we examine the three statutory schemes at issue.

### A.

The LPCL's purpose "is to 'secure for the public the benefits of unfettered competition.'" Meadowbrook Carting, 138 N.J. at 313 (quoting Terminal Constr. Corp. v. Atl. Cnty. Sewerage Auth., 67 N.J. 403, 410

21

(1975)). "To that end, the Legislature has enacted a comprehensive statutory framework governing public contracts." <u>Clean Earth Dredging Techs., Inc. v. Hudson Cnty. Improvement Auth.</u>, 379 N.J. Super. 261, 267 (App. Div. 2005). "Public bidding statutes exist for the benefit of taxpayers, not bidders, and should be construed with sole reference to the public good." <u>Nat'l Waste Recycling, Inc. v. Middlesex Cnty. Improvement Auth.</u>, 150 N.J. 209, 220 (1997).

The LPCL requires

> [e]very contract awarded by [a] contracting agent for the provision or performance of any goods or services, the cost of which in the aggregate exceeds the bid threshold, [to] be awarded only by resolution of the governing body of the contracting unit to the lowest responsible bidder after public advertising for bids and bidding therefor, <u>except as is provided otherwise in [the LPCL] or specifically by any other law</u>.
>
> [N.J.S.A. 40A:11-4(a) (emphasis added).]

The BCIA is a "contracting unit" under the LPCL, <u>see</u> <u>N.J.S.A.</u> 40A:11-2(1)(c), and its "governing body" is a "[c]ontracting agent." N.J.S.A. 40A:11-2(3). "'[G]oods or services' means any work, labor, commodities, equipment, materials, or supplies of any tangible or intangible nature, except real property

or any interest therein, provided or performed through a contract awarded by a contracting agent." N.J.S.A. 40A:11-2(24).[8]

Prior to a 1975 amendment, N.J.S.A. 40:37A-55(n) empowered a county improvement authority "[t]o enter into any and all agreements or contracts, execute any and all instruments, and do and perform any and all acts or things necessary, convenient or desirable for the purposes of the authority or to carry out any power expressly given in this act." L. 1960, c. 183, § 12. The 1975 amendment added the phrase "subject to the 'Local Public Contracts Law'" to the end of the previously unqualified statement. L. 1975, c. 96, § 6.[9]

The 1975 amendment not only made county improvement authorities subject to the LPCL, but it also amended the enabling statutes governing many other county and municipal authorities including, for example, parking, sewerage, county recreation, and solid waste management authorities. L. 1975, c. 96, §§ 1-15. The Sponsor's Statement to the bill explained:

> The purpose of this bill is to clarify the existing law and to restate the intention of the Legislature with regard to the impact of the [LPCL] on municipal and county authorities. Since the [LPCL] was adopted, a

---

[8] Contracts for certain goods and services are excepted from the public bidding requirements. N.J.S.A. 40A:11-5. As already noted, defendants do not contend that these exceptions apply in this case.

[9] This provision is now codified at N.J.S.A. 40:37A-55(t) due to additional amendments to the CIAL.

court has held that despite the provision of the [LPCL] to the contrary, it did not affect the powers of municipal authorities to enter into contracts in disregard of it.  This bill will amend various statutes regulating authorities and subject them specifically to the [LPCL].

[Sponsor's Statement to S. 711 (L. 1975, c. 96) (emphasis added).]

It is beyond debate that the LPCL requires a county improvement authority to publicly bid the hiring of a general contractor to rehabilitate its property if the contract exceeds the statutory bid threshold.  See N.J.S.A. 40A:11-3 (defining the bid threshold).  Neither the BCIA nor the County contend otherwise.

Instead, defendants contend that while the LPCL may generally apply to county improvement authorities, it does not apply if "provided otherwise . . . specifically by any other law."  N.J.S.A. 40A:11-4(a).  Defendants contend the "other law" in this case are certain provisions of the CIAL and the LRHL.

B.

The 1979 amendments to the CIAL not only granted redevelopment powers to county improvement authorities, but it also vested them with the power to finance and operate housing projects.  The preamble to the legislation stated that it was "[a]n Act concerning county improvement authorities, vesting them with necessary powers to undertake, finance and operate housing projects and to redevelop property in connection therewith . . . ."  A. 3430

24

(1979). The bill was apparently introduced in response to a housing crisis experienced in Atlantic City at the time. As explained by the Senate County and Municipal Government Committee:

> The purpose of Assembly 3430 is to afford the Atlantic County Improvement Authority powers to deal with the current housing crisis in Atlantic City. The bill has been recommended by the Governor's Cabinet Committee on Atlantic City, and is necessary to complete implementation of Assembly 3313, which would phase out the Atlantic City luxury tax and direct it from the city to a special fund to back County Improvement Authority bonds.
>
> The bill accords all county improvement authorities certain powers, which would be in addition to the public facilities construction and public services powers they currently possess. The additional powers are: (1) to act as a housing finance agency to promote construction of low and moderate income housing; and, (2) to act as a redevelopment agency to plan and carry out the redevelopment of blighted areas.
>
> [S. Cnty. & Mun. Gov't Comm. Statement to A. 3430 (June 21, 1979).]

The provisions specifically enabling county improvement authorities to undertake, finance and operate housing projects were newly added extensions to the existing CIAL. L. 1979, c. 275, §§ 1-30; N.J.S.A. 40:37A-106 to -135.

However, the redevelopment powers granted by the 1979 amendments were contained within the body of the existing CIAL. N.J.S.A. 40:37A-54 describes the purposes of a county improvement authority. The 1979

25

amendment added two of particular relevance: (1) providing loans to facilitate the construction of low- and moderate-income housing; and (2) "planning, initiating and carrying out redevelopment projects . . . and the disposition . . . of any property . . . acquired in the area of such project." A. 3430, § 32; N.J.S.A. 40:37A-54(a), (i), and (j). N.J.S.A. 40:37A-55 governs the powers and duties of a county improvement authority. The 1979 amendment to the CIAL added one power relevant to these appeals, namely, giving improvement authorities the ability "[t]o extend credit or make loans to redevelopers for the planning, designing, acquiring, constructing, reconstructing, improving, equipping and furnishing any redevelopment project or redevelopment work." A. 3430, § 33; N.J.S.A. 40:37A-55(q) (emphasis added). Interestingly, this new power, along with two others not relevant here, were inserted in the alphabetized list of powers already in N.J.S.A. 40:37-55; these new powers were inserted immediately before the existing provision that authorized an improvement authority to enter into agreements or contracts and do all things necessary to carry out its powers, subject to the LPCL. L. 1979, c. 275, § 33.

The 1979 amendments also added an entirely new section, N.J.S.A. 40:37A-55.1, that describes an authority's redevelopment powers. Among other powers, a county improvement authority may:

> Arrange or contract with public agencies or redevelopers for the planning, replanning,

A-2201-20

conservation, rehabilitation, construction, or undertaking of any project, or redevelopment work, or any part thereof, to provide as part of any such arrangement or contract for extension of credit or making of loans to redevelopers to finance any project or redevelopment work, and to arrange or contract with public agencies for the opening, grading or closing of streets, roads, roadways, alleys, or other places or for the furnishing of facilities or for the acquisition by such agency of property options or property rights or for the furnishing of property or services in connection with a redevelopment area.

[N.J.S.A. 40:37A-55.1(i).][10]

However, all these redevelopment powers were made expressly "subject to the provisions of this act." N.J.S.A. 40:37A-55.1.

We reject any implication that the use of the phrase "this act" signals the Legislature's intention to set apart the newly enacted redevelopment powers from other provisions of the CIAL, thereby eliminating the requirement that a county improvement authority comply with the LPCL when it acts as a redevelopment entity. We acknowledge some authority for the proposition that the use of the phrase "this act" signals the Legislature's reference only to the 1979 amendments and not the CIAL in its entirety. See, e.g., Ptaszynski v.

---

[10] These powers are like those granted to redevelopment entities pursuant to the later enacted LRHL, although redevelopment entities may in limited circumstances also provide capital grants to redevelopers. See N.J.S.A. 40A:12A-8(f).

27

Atl. Health Sys., Inc., 440 N.J. Super. 24, 35 (App. Div. 2015) ("[t]he plain language . . . and the context in which the phrase 'this act' is used . . . indicate that the Legislature intended the phrase to mean the amendatory legislation"). However, the entire structure of the CIAL persuades us otherwise.

Initially, as noted, the Legislature granted county improvement authorities new redevelopment powers in the 1979 amendments, but, unlike the sweeping changes which were added to the existing CIAL that permitted authorities to construct housing, the Legislature included these new redevelopment powers — N.J.S.A. 40:37A-54, -55, and -55.1, for example — within existing provisions of the CIAL. Moreover, when the LRHL was enacted in 1992, the only other public entities with redevelopment powers were municipal redevelopment and housing authorities. The LRHL explicitly required that they comply with the LPCL. See N.J.S.A. 40A:12A-23. Logically, the Legislature did not need to add county improvement authorities to N.J.S.A. 40A:12A-23 because since 1975, seventeen years before enactment of the LRHL, the CIAL was amended to require compliance with the LPCL. See N.J.S.A. 40:37A-55(t).

In short, by its terms, the CIAL does not exempt county improvement authorities from complying with the LPCL when procuring "goods and

services" simply because they are acting pursuant to redevelopment powers granted by the Legislature.

C.

When enacted in 1992, the LRHL was intended to "revise[], consolidate[] and clarif[y] the various statutes related to the exercise of redevelopment and housing powers by local governments into a modern and comprehensive statute." Sponsor's Statement to A. 1138 (L. 1992, c. 79). Notably, while the LRHL repealed certain sections of the 1979 amendments to the CIAL, it left undisturbed those provisions granting redevelopment powers to county improvement authorities.

The LRHL provides that only if a "county improvement authority [is] authorized to undertake redevelopment projects pursuant to the [CIAL] may [it] also act as a redevelopment entity pursuant to [the LRHL]." N.J.S.A. 40A:12A-4(c). The LRHL clearly permits a redevelopment entity to "contract with . . . redevelopers for the . . . construction . . . of any project or redevelopment work, or any part thereof." N.J.S.A. 40A:12A-8(f). See also N.J.S.A. 40:37-55.1(i) (allowing county improvement authorities to do the same).

As noted, N.J.S.A. 40A:12A-8(g) permits a redevelopment entity to "lease or convey property or improvements to any other party . . . without

public bidding." No other section of the LRHL relieves a redevelopment entity from the strictures of the LPCL, which explicitly apply to municipal housing authorities and redevelopment agencies. N.J.S.A. 40A:12A-23.[11] Defendants argue that pursuant to the LRHL, redevelopment entities are permitted to choose a redeveloper without public bidding. We have no quarrel with this general proposition.

We previously held that "the LRHL does not set forth any criteria governing the selection of a private redeveloper." Vineland Constr. Co., 395 N.J. Super. at 255. Typically, however, contracts with redevelopers specify the parameters of a redevelopment project with costs borne by the redeveloper, who then is entitled to reap revenues from the project. See, e.g., id. at 243 (developer and its partners "planned to provide all of the invested capital" for a waterfront redevelopment project with estimated cost exceeding $700 million); Deegan v. Perth Amboy Redevelopment Agency, 374 N.J. Super. 80, 82 (App. Div. 2005) (proposed redevelopment project "would consist of approximately 250 rental apartments, a supermarket, retail space, a walkway/park and parking facilities"); Bryant, 309 N.J. Super. at 622 (redeveloper "agree[d] to commit

---

[11] N.J.S.A. 40A:12A-39, which deals with cooperation in the planning and execution of a redevelopment project, permits a "public body" to aid and cooperate in redevelopment efforts "with or without consideration."

millions of dollars towards construction of the planned resort"). Nothing in our caselaw suggests that by giving county improvement authorities the power to contract with redevelopers, the Legislature intended to allow a public agency to use public funds to pay a general contractor without complying with the LPCL simply by denominating the contractor as a "redeveloper."

Indeed, one need only look at N.J.S.A. 40A:12A-9, which concerns agreements with redevelopers, to appreciate how alien the arrangement anticipated in this case is from a typical redeveloper agreement. Pursuant to that section of the LRHL,

> [a]ll agreements . . . and other instruments . . . between a . . . redevelopment entity and . . . a redeveloper shall contain a covenant running with the land requiring that the owner shall construct only the uses established in the current redevelopment plan; . . . a provision that the redeveloper shall be without power to sell, lease or otherwise transfer the redevelopment . . . project, or any part thereof, without the written consent of the . . . redevelopment entity; a provision that upon completion of the required improvements, the conditions determined to exist at the time the area was determined to be in need of redevelopment shall be deemed to no longer exist, and the land and improvements thereon shall no longer be subject to eminent domain as a result of those determinations; and any other covenants, provisions and continuing controls as may be deemed necessary to effectuate the purposes of this act. The aforesaid covenants, provisions and controls shall be deemed satisfied upon termination of the agreements and covenants entered into by the redeveloper to construct the improvements and to perform the redevelopment.

31

[N.J.S.A. 40A:12A-9(a) (emphasis added).]

A redevelopment entity may lease property to a redeveloper, with a proviso that all improvements shall became property of the entity.  N.J.S.A. 40A:12-9(b).  But, such a lease "shall not impose upon the . . . redevelopment entity any liability for the financing, construction, management or operation of any redevelopment project, or any part thereof."  Ibid.  The express terms of the LRHL do not anticipate a contract with a "redeveloper" like the one proposed by the RFQ in this case.

We conclude that under these particular facts, the BCIA cannot avoid the requirements of public bidding for "goods or services" covered by the LPCL simply by cloaking itself in the rubric of a redevelopment entity under the LRHL and designating the general contractor for the project as a "redeveloper."  We therefore reverse the order under review in A-2202-20 and remand the matter to the trial court to enter an order permanently restraining the BCIA from proceeding with the procurement process contemplated by the RFQ.

Affirmed in A-2201-20; reversed and remanded in A-2202-20.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION